# 24-1852-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤◄◄

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

JOSEPH BIGGS, JASON SULLIVAN, MARCOS CRUZ,

*Defendants,*

NICHOLAS TARTAGLIONE,

*Defendant-Appellant.*

————————————

*On Appeal from the United States District Court
for the Southern District of New York*

## CORRECTED BRIEF FOR DEFENDANT-APPELLANT

SUSAN C. WOLFE
2400 Johnson Avenue
Suite 1G
Riverdale, NY 10463
917-209-0441

INGA L. PARSONS
  ATTORNEY AT LAW
3 Bessom Street, Suite 234
Marblehead, MA 01945
781-581-2262

MARSHA R. TAUBENHAUS
1632 1st Avenue, # 21040
New York, NY 10028
917-426-4880

*Attorneys for Defendant-Appellant*



PHP (212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF CASES AND OTHER AUTHORITIES ............................. iii

JURISDICTIONAL STATEMENT ............................................. 1

QUESTIONS PRESENTED ...................................................... 2

STATEMENT OF THE CASE ................................................... 3

STATEMENT OF FACTS ........................................................ 3

    The Trial ...................................................................... 6

        Jury Selection ........................................................ 6

        *A. Pre-trial Coverage and Gossip* .......................... 6

            1. Pre-trial Publicity ......................................... 6

            2. Gossip About Appellant During *Voir Dire* ....................................................... 7

            3. *Voir Dire* Questions Regarding Knowledge of the Case ................................. 8

        *B. The Trial Judge's Response to a Potential Juror's Expression of Bias* ...................................... 9

        *C. Other Challenges for Cause* ............................... 16

    The Government's Case ................................................. 18

        Mario Cruz – The Vomiting Witness ..................... 19

**Page**

**SUMMARY OF ARGUMENT** ................................................................ 23

**ARGUMENT**

    **POINT I**
    THE MANNER IN WHICH THE TRIAL COURT CON-
    DUCTED VOIR DIRE DISCOURAGED PANEL MEM-
    BERS FROM DISCLOSING ANY BIASES AND
    FAVORED THE GOVERNMENT, THUS DEPRIVING
    APPELLANT OF A FAIR TRIAL .................................................... 24

        1. Standard of Review ............................................................ 25

        2. The District Court tainted the *voir dire* process by its
        treatment of a panelist who expressed bias in open court ...... 27

        3. By granting government challenges for cause without
        an adequate showing of bias, while denying a defense
        challenge where prejudice was either evident or inferable,
        the trial court failed to conduct *voir dire* in an even-
        handed manner ................................................................... 34

    **POINT II**
    THE TRIAL COURT DEPRIVED APPELLANT OF A FAIR
    TRIAL BY FAILING TO TAKE ANY CURATIVE ACTION
    AFTER A GOVERNMENT WITNESS'S EXTRAORDINARY
    DISPLAY OF EMOTIONS .............................................................. 40

    **POINT III**
    THE TRIAL COURT DEPRIVED APPELLANT OF A FAIR
    TRIAL BY IMPROPRLY (A)(1) ADMITTING THE GOVERN-
    MENT'S 'PROOF OF INTENT'EVIDENCE WHILE EX-
    CLUDING EQUIVALENT DEFENSE EVIDENCE; (A)(2)
    ADMITTING 'THREAT' EVIDENCE, WHILE EXCLUDING
    EQUIVALENT DAMAGING EVIDENCE AGAINST A KEY
    WITNESS AGAINST HIM;; (B)(1) IMPROPERLY AD-

**Page**

MITTING THE GOVERNMENT'S DNA REPORT OVER HEARSAY OBJECTIONS; AND (B)(2) IMPROPERLY ADMITTING CELL-SITE LOCATION EVIDENCE DESPITE THE GOVERNMENT'S FAILURE TO PRESERVE THE UNDERLYING TEST DATA .................................................. 45

Standard of Review ................................................. 46

    (A)(1) *Statements of Future Intent* ....................................... 46

    (A)(2) *Threat Evidence* .......................................... 48

    (B)(1) *DNA Evidence* ........................................... 54

    (B)(2) *Cell Site Location Evidence* ...................................... 58

        A. The Unreliability of The Drive Test Evidence ........ 58

        B. The Failure to Preserve Underlying Data from The Drive Test ................................................ 66

**POINT IV**
SINCE THE GOVERNMENT'S EVIDENCE AT TRIAL ESTABLISHED THAT THE ALLEGED DRUG CONSPIRACY ENDED WELL BEFORE THE MURDERS OCCURRED, THE EVIDENCE WAS INSUFFICENT TO PROVE APPELLANT WAS GUILTY OF MURDER IN FURTHERANCE OF AN ONGOING DRUG CONSPIRACY ................................................... 71

    1. Standard of Review ........................................ 71

    2. The Evidence Established That No Drug Conspiracy Exited When the Victims Were Allegedly Kidnapped and Murdered ................................................ 72

**CONCLUSION** ................................................ 74

**Page**

# TABLE OF AUTHORITIES

## TABLE OF CASES

<u>Aldridge</u> v. <u>United States</u>, 283 U.S. 308 (1931) ........................................ 30

*In re Application Of U.S. for an Order for Disclosure*,
405 F.Supp.2d 435 (S.D.N.Y. 2005) ........................................ 60-61

<u>Bullcoming</u> v. <u>New Mexico</u>, 564 U.S. 647 131 S.Ct. 2705
(2011) ........................................ 57

<u>Daubert</u> v. <u>Merrell Dow Pharmaceuticals, Inc.</u>,
509 U.S. 579 (1993) ........................................ 68

<u>Duncan</u> v. <u>State</u>, 349 S.E.2d 699 (1986) ........................................ 43

<u>Ducote</u> v. <u>Phelps</u>, 07-374 (D.Del. 2020) ........................................ 43

<u>Estelle</u> v. <u>Williams</u>, 425 U.S. 501
(1976) ........................................

<u>Finney</u> v. <u>State</u>, 660 So.2d 674 (Fla. 1995) ........................................ 43

<u>Garlick</u> v. <u>Lee</u>, 1 F.4th 122 (2d Cir. 2021) ........................................ 57

**Page**

Gomez v. United States, 490 U.S. 858
(1989) ............................................................................... 24

Griffin v. City of Opa-Locka, 261 F.3d 1295 (11th Cir. 2001) ................... 42

Heath v. LaValley, 11-cv-2962 (E.D.N.Y. 2014) ....................................... 42

Holbrook v. Commonwealth, 525 S.W.3d 73 (Ky. 2017) ......................... 63

Hunley v. Godinez, 975 F.2d 316 (7th Cir. 1992)...................................... 26

Hutchinson v. Groskin, 927 F.2d 722(2d Cir. 1991) ................................. 62

Idaho v. Kohberger, cr-01-24-31665 (Ida. Dist.Ct. 2024) ........................ 67

Irvin v. Dowd, 366 U.S. 717 (1961) ........................................................ 24

Jackson v. Virginia, 443 U.S. 307 (1979) ................................................ 71

Koon v. United States, 518 U.S. 81 (1996) .............................................. 46

Kutzner v. Johnson, 242 F.3d 605 (5th Cir. 2001) ................................ 42-43

McDonough Power Equip., Inc. v. Greenwood,
464 U.S. 548 (1984) .............................................................................. 36

Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527
(2009) .................................................................................................. 57

Messer v. Kemp, 760 F.2d 1080 (11th Cir. 1985) ..................................... 43

Morgan v. Illinois, 504 U.S. 719 (1992) ......................................... 24,57,80

Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285 (1892) .................... 46

v

**Page**

N.J. v. Burney, 298 A.3d 1080(N.J. 2023) ................................................... 59

People v. Marino, 414 Ill. 445 (1953) ......................................................... 30

Phillips v. Smith, 485 F.Supp.3d 1365 (S.D.N.Y. 1980) ........................... 28

Price v. Texas, 626 S.W.2d 833 (Tex. Appp. 1981) .................................... 34

Richmond v. State, 791 S.W.2d 691 (Ark. 1990) ........................................ 43

Rosales-Lopez v. United States, 451 U.S. 182 (1981) ................................ 27

Smith v. Arizona, 602 U.S. 779, 144 S.Ct. 1785 (2024) ............................. 66

State v. Alexis, 185 A.3d 526 (R.I. 2018) .................................................... 41

Taylor v. Kentucky, 436 U.S. 478 (1978) .................................................... 45

United States v. Acosta, 19-2189 (2d Cir. Nov. 2, 2020) ........................... 72

United States v. Aguilar, 585 F.3d 652 (2d Cir. 2009) ............................... 74

United States v. Al-Farekh, 956 F.3d 99 (2d Cir. 2020) ............................. 46

United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2008)........................... 45

United States v. Baker, 58 F.4th 1109 (9th Cir. 2023) ................................. 59

United States v. Best, 219 F.3d 192 (2d Cir. 2000),
cert. denied, 532 U.S. 1007 (2001) ...............................................................46

United States ex rel. Brown v. Smith,306 F.2d 596 (2d Cir. 1962) ............ 37

United States v. Cervantes, No. 12-cr-792 (N.D. Cal. Dec. 1, 2015) .... 63-64

United States v. Check, 582 F.2d 668 (2d Cir. 1978) ................................. 55

**Page**

United States v. Colabella, 448 F.2d 1299 (2d Cir. 1971) .................... 28, 34

United States v. Coplan, 703 F.3d 46 (2d Cir. 2012) ................................ 71

U.S. v. Cruz, 16-cr-832 ............................................................................ 23

United States v. Desinor, 525 F.3d 193 (2d Cir. 2008) ............................ 74

United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2003) ........................... 68

United States v. Figueroa, 548 F.3d 222 (2d Cir. 2008) .............................. 51

United States v. Figueroa, 618 F.2d 934(2d Cir. 1980) .................... 41, 46, 50

United States v. Francis, 141 F.4th 90 (3d Cir. 2025) ................................. 37

United States v. Frazier, 442 F.Supp.3d 1012 (M.D. Tenn. 2020) ............. 61

United States v. Gamble, 290 Fed.Appx. 592 (4th Cir. 2008) .................... 41

United States v. Gonzalez, 214 F.3d 1109 (9th Cir. 2000) ......................... 26

United States v. Greer, 285 F.3d 158 (2d Cir. 2002) ................................. 36

United States v. Greer, 998 F.Supp.3d 399 (D. Vt. 1998), *aff'd
in part and vacated in part on other grounds,* 285 F. 3d 158
(2d Cir. 2002) ........................................................................................... 36

United States v. Guerrero, 813 F.3d 462 (2d Cir. 2016) ............................ 72

United States v. Harris, 733 F.2d 994 (2d Cir. 1984) ................................. 48

United States v. Haynes, 398 F.2d 980 (2d Cir. 1968)........................... 26.41

United States v. Hill, 818 F.3d 289 (7th 2016) ........................................... 59

United States v. James, 712 F.3d 79 (2d Cir. 2013) ................................... 64

**Page**

United States v. Kelly, 128 F.4th 387 (2d Cir. 2025) .................................. 25

United States v. Kemp, 21-1684 (2d Cir. Jan. 26, 2023) .......................... 74

United States v. Lawes, 292 F.3d 123 (2d Cir. 2002) ............................... 29

United States v. McCoy, 995 F.3d 32 (2d Cir. 2021) ............................... 27

United States v. Medley, 312 F.Supp.3d 493 (D. Md. 2018),
*aff'd* 34 F.4th 326 (4th Cir. 2022) ....................................................... 59

United States v. Mensah, 110 F.4th 510 (2d Cir. 2024) ......................... 25, 37

United States v. Meserve, 271 F.3d 314(1st Cir. 2001) .............................. 55

United States v. Morgan, 292 F.Supp.3d 475 (D.D.C. 2018),
*aff'd* 45 F.4th 192 (D.C. Cir. 2022) ..................................... 51,62,63,64,69,70

United States v. Morales, 185 F.3d 74 (2d Cir. 1999) ............................... 25

United States v. Munoz, No. 16-3890-cr. (2d Cir. 2019) .......................... 50

United States v. Nelson, 277 F.3d 164 (2d Cir. 2002) .............................. 38

United States v. Nieves, 58 F.4th 623 (2d Cir. 2023) ............................. 25,26

United States v. Paradies, 98 F.3d 1266 (11th Cir. 1996) .......................... 37

United States v. Parse, 789 F.3d 83 (2d Cir. 2015) ................................... 27

United States v. Pembrook, 119 F.Supp.3d 577 (E.D. Mich. 2015) ........... 60

United States v. Parse, 789 F.3d 83 (2d Cir. 2015) ............................... 29,55

United States *v.* Powell, 2022 WL 4451389 (E.D.N.Y. 2022) ................... 61

viii

**Page**

United States v. Quinones, 511 F. 3d 289 (2d Cir. 2007) ...................... 26,55

United States v. Ray, 20-cr-110 (S.D.N.Y. 2022) ...................................... 61

United States v. Robinson, 566 F.2d 507 (2d Cir. 1977) .......................... 40

United States *v.* Rosario, 2014 WL 6076364 (S.D.N.Y. 2014) ................. 61

United States v. Rowe, 106 F.3d 1226 (5th Cir. 1997) .......................... 15,28

United States v. Rucker, 586 F.2d 899 (2d Cir. 1978) .............................. 72

United States v. Sabhani, 599 F.3d 215 (2d Cir. 2010) ............................. 71

United States v. Santiago-Ortiz, 18-3830 (2d Cir. Dec. 18, 2019).............. 74

United States v. Santos, 541 F.3d 63 (2d Cir. 2008) ........................... 72, 73

United States v. Seward, 135 F.4th  161 (4th Cir. 2025) ............................ 58

United States v. Shavers, 693 F.3d 363 (3d Cir. 2012) .............................. 42

United States v. Sithithongtham, 192 F.3d 119 (8th Cir. 1999) ................. 38

United States v. Smith, 534 F.3d 1211(10th Cir. 2008) .............................. 41

United States v. Spruill, No. 13-4060-cr (2d Cir. 2015) ............................ 55

United States v. Torres, 128 F.3d 38(2d Cir. 1997), *cert. denied,*
523 U.S. 1065 (1998) ........................................................................ 26, 27

United States v. Tracy, 12 F.3d 1186 (2d Cir. 1993) ................................. 57

United States v. Valle, 807 F.3d 508 (2d Cir. 2015) ................................. 72

United States v. Vernace, 811 F.3d 608 (2d Cir. 2016) ............................. 72

United States v. Williams, 585 F.3d 707 (2d Cir. 2009) ............................ 46

ix

**Page**

United States v. Williams, 596 F.2d 44 (2d Cir.), *cert. denied,* 442 U.S. 946 (1979) ............................................................... 51

United States v. Xavier, 2 F.3d 1281 (3rd Cir. 1993) ..................................... 43

United States v. Zhong, 26 F.4th 536 (2d Cir. 2022) ..................................... 45

Westfield Ins. Co. v. Harris, 134 F.3d 608(4th Cir. 1998) .......................... 41

Whitehead v. Cowan, 263 F.3d 708 (7th Cir. 2001) ..................................... 43

## STATUTES AND RULES

FED. R. APP. P. 28(a) ..................................................................... 1

Fed.R.Crim.P. 12 ............................................................................... 55

Fed.R.Crim.P. 12, *Subdivisions (b)(1)* and *(2),* Notes of Advisory Committee ....................................................................................... 62

Fed.R.Evid. 403, Notes of Advisory Committee ....................................... 41

FED.R.EVID. 803(3) ............................................................................ 46

N.Y. PENAL CODE §155.25 ................................................................. 36

18 U.S.C. § 2 ..................................................................................1,2

18 U.S.C. § 924(j) .............................................................................. 3

21 U.S.C. § 841(b)(1)(A) ..................................................................... 1

18 U.S.C. § 1201................................................................................ 1,2

18 U.S.C. § 1952 ................................................................................ 2

x

**Page**

18 U.S.C. § 3231 ................................................................. 2

21 U.S.C. § 841(b)(1)(A) .................................................... 1

21 U.S.C. § 846 ................................................................ 1

21 U.S.C. § 848(e) ............................................................ 2

28 U.S.C. § 1291 .............................................................. 2

## OTHER AUTHORITIES

Frank P. Andreano, *Voir Dire: New Research Challenges Old Assumptions,* 95 ILL. B. J. 474 (2007) ...................................... 27

Aaron Blank*, The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone,* 18 RICH. J.L. & TECH. 3 (Fall 2011) ................................................................ 60

John Blume, Sheri Lynn Johnson, A. Brian Threlkeld, *Probing "Life Qualification" Through Expanded Voir dire,* 29 Hofstra L. Rev. 1209 (2001) ........................................................ 24

Kiel Brennan-Marquez & Julia Simon-Kerr, *Judging Demeanor*, 109 Minn. L. Rev. 1503 (2025) ................................. 41

Dale W. Broeder, *Voir Dire Examination: An Empirical Study,* 38 S. Cal. L. Rev. 503 (1964) ............................................. 30

FBI Criminal Investigative Division, <u>Cellular Analysis Survey Team Policy Guide</u>, ¶4.9.1 (Jan. 5, 2018) ................................... 67

**Page**

Michael Gentithes & Matthew Tokson, *The Reality of the Good Faith Exception,* 353 Akron Law Faculty Pubs. 551 (2025) ...................... 66

Alan M. Goldstein, *Handbook of Psychology: Volume 11 Forensic Psychology* (John Wiley & Sons, eds. 2003) .............................. 32
.
Natalie Gordon, "*Improving the Accuracy of Juror Self-Reports of Bias During Rehabilitative Voir Dire,*" CUNY Academic Works (2021) .......... 39

Catherine M. Grosso and Barbara O'Brien, *Lawyers and Jurors: Interrogating Voir Dire Strategies by Analyzing Conversations*, 16 J. EMPIRICAL LEGAL STUDIES 515 (2019) ................................................ 30

Joshua A. Haby, *The Effect of Voir Dire Variations on Juror Disclosures*, Dissertations and Doctoral Documents, UNIV. NEBRASKA-LINCOLN (2025) .......................................... 32

Valerie P. Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 CHI.KENT L. REV. 1179 (2003) ...................... 30,31

Int'l Telecommunications Union, *Attenuation in Vegetation, Recommendation* ITU-R P.833-7 (Feb. 2012) ....................................... 71-72

Vladan M. Jovanovic, Brian T. Cummings, *Analysis of Mobile Phone Geolocation Methods Used in US Courts,* 11 IEEE 28037 (2023) ......................................................................................... 62,63

Thomas J. Kirkham, *Comment, Rejecting Historical Cell Site Location Information as Unreliable Under Daubert and Rule 702*, 50 U. TOL. L. REV. 68 361 (2019) ....................................... 59

Nancy S. Marder, *Juror Bias, Voir Dire, and the Judge-Jury Relationship*, 90 Chi-Kent L.Rev. 927 (2015) .......................................... 27

Andrew McQuilkin, *Sleeping Gate-Keepers: Challenging the Admissibility of Cell-Phone Forensic Evidence Under Daubert,*

11 J. HIGH TECH. L. 365 (2011) ................................................................. 59

John B. Minor, *Forensic Cell Site Analysis: A Validation & Error Mitigation Methodology,* J. OF DIGITAL FORENSICS, SECURITY AND LAW, Vol. 12, No.2, Art. 7 (2017) ...................................... 62

Barbara O'Brien & Catherine M. Grosso, *Judges, Lawyers, and Willing Jurors: A Tale of Two Jury Selections*, 98 CHI.KENT L. REV. 111 (2024) ....................................................................................... 32

*Otisville, New York,* Wikipedia, https://en.wikipedia.org/wiki/Otisville_New_York ........................................................................... 61
Retired Police Officer Accused of Killing 4 Amid Cocaine Conspiracy, CBS NEW YORK, Dec. 20, 2016 ........................................... 6, 7

Eli Rosenberg & William K. Rashbaum, *New Details Emerge in Murder Case After Ex-Officer's Suicide*, NEW YORK TIMES, March 9, 2017, available at https://www.nytimes.com/ 2017/03/09/nyregion/gerard-benderoth-suicide-drug-plot.html ....................................... 6

C. L. Ruva, S. E. Diaz Ortega, & K. A. O'Grady, *What Drives a Jury's Deliberation? The Influence of Pretrial Publicity and Jury Composition On Deliberation Slant and Content*, PSYCHOLOGY, PUBLIC POLICY, AND LAW, *28*(1), 32–52 (2022) ....................................... 43

Victoria Saxe, *Junk Evidence: A Call to Scrutinize Historical Cell Site Location Evidence*, 19 U.N.H. L. Rev. 133 (2020) ........... 58-59,62

Todd A. Spodek, *Understanding Cell-Site Evidence in Criminal Cases: What It Is, How It's Used, and Why It Matters*, at p.2, medium.com/spodeklawgroup/understanding-cell-site-evidence-in-criminal-cases-what-it-is-how-its-used-and-why-it-matters-fl786-ace6133 ............................................................... 60-61

Tracy L. Treger, *One Jury Indivisible: A Group Dynamics Approach to Voir Dire,* 68 CHI. KENT. L. REV. 549 (1992) ................... 30-31

Anna S.P. Wong, *Looks Can Be Deceiving: The Irrelevance of Demeanor in Witness Assessments,* 68 Crim. L. Quarterly 345 (2020) ....................................................................................... 41

**Page**

Kimba M. Wood, *Reexamining the Access Doctrine*,
69 S.Cal. L. Rev. 1105 (1996) ................................................................. 28

UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT

_____

Docket No. 24-1852-cr

_____

UNITED STATES OF AMERICA,
Appellee,

-against-

NICHOLAS TARTAGLIONE,
Defendant-Appellant.


_____

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF FOR APPELLANT NICHOLAS TARTAGLIONE**

_____

**JURISDICTIONAL STATEMENT PURSUANT TO FED. R. APP. P. 28(a)**

This is an appeal from a final judgment of the U.S. District Court for the

Southern District of New York (Hon. Kenneth M. Karas, U.S.D.J.), rendered June

24, 2024, convicting appellant after trial of: a cocaine distribution conspiracy (21

U.S.C. §§ 846, 841(b)(1)(A)); murder in furtherance of a drug crime (four counts)(21

U.S.C. § 848(e)); murder with a firearm (three counts)(18 U.S.C. § 924(j)); conspir-

acy to kidnap (18 U.S.C. § 1201(c)); aiding and abetting kidnapping resulting in

1

death(four counts)(18 U.S.C. § 1201(a)(1)); aiding and abetting a Travel Act murder (four counts)(18 U.S.C. § 1952). He was sentenced to four consecutive life sentences. Jurisdiction is in this Court pursuant to 28 U.S.C. § 1291. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. Appellant filed a timely notice of appeal on June 13, 2024 (A173).[1]

## QUESTIONS PRESENTED

1.      Whether the trial court's manner of jury selection deprived appellant of a fair trial, by discouraging panel members from disclosing biases and favoring the government.

2.      Whether the trial court's failure to take any curative action in response to a government witness's extraordinary emotional outbursts deprived appellant of a fair trial.

3.      Whether the trial court deprived appellant of a fair trial by improperly: (A)(1) admitting the government's 'proof of intent' evidence while excluding equivalent defense evidence; (A)(2) admitting 'threat' evidence while excluding comparably damaging evidence against a key government witness; (B)(1) admitting DNA

---

[1] Numbers in parentheses preceded by "A" refer to appellant's appendix; those preceded by "T" are to the trial transcript; and those preceded by "PSI" are to the Presentence Investigation Report.

analyses from non-testifying biologists; and (B)(2) admitting unreliable cell-site location evidence despite the government's failure to preserve underlying test data.

4.      Whether, since the evidence established that any drug conspiracy ended before the murders occurred, it was insufficient to prove appellant's guilt of murder in furtherance of an ongoing drug conspiracy.

## STATEMENT OF THE CASE

Nicholas Tartaglione ("Tartaglione") appeals from his conviction, after trial, of a cocaine distribution conspiracy; murder in furtherance of a drug crime (four counts); murder through use of a firearm (three counts); conspiracy to kidnap and aiding and abetting kidnapping resulting in death (four counts); aiding and abetting a Travel Act murder (four counts). On June 10, 2024, the district court sentenced Mr. Tartaglione to four consecutive terms of life imprisonment and five years of supervised release (A165).

## STATEMENT OF FACTS

Tartaglione was a police officer for most of his professional career (PSI p.24, ¶133). Following his retirement in 2008, he started an animal sanctuary, devoting his time, money, and efforts to rescued animals. *Id.*

Tartaglione was arrested on December 19, 2016, and charged in a 17-Count indictment for four murders and a drug conspiracy (PSI pp. 1-5). He has

3

consistently maintained his innocence. A jury trial began on March 13, 2023. The key witnesses were cooperators Marcos Cruz, Joseph Briggs and Jason Sullivan. Gerard Benderoth, another alleged co-conspirator, committed suicide before he could be questioned by the FBI (PSI p.60) .

During post-arrest interviews with law enforcement, Cruz, Biggs and Sullivan all admitted their guilt but exonerated Tartaglione. They implicated Tartaglione after facing coercion and threats from lead investigator William Young, over the course of ninety plus meetings with the prosecution. Although Young was the lead investigator and assisted the prosecutors in court, the government never called him as a witness.

The prosecution changed their theory of the murders multiple times. For example, it originally informed defense counsel that appellant was involved in one murder. Later, they accused him of participating in four. *See* Dkt.#424 at p. 12; Dkt.#41 at p. 2.

Its theory at trial was that Tartaglione strangled Luna at his brother's bar, with the help of Biggs and Benderoth, because Luna owed him money. (T679, 682). The government claimed that the three other victims happened to be at the bar, were tied up, and later shot by Biggs, Benderoth and Tartaglione, and then buried on Tartaglione's property. (T683-685) At trial, Cruz, Biggs and Sullivan, despite their initial statements to law enforcement, implicated appellant in the murders.

4

The defense maintained that Biggs strangled Luna (T3162);[2] either Biggs or Benderoth shot the other three (T3170); and the drug conspiracy consisted of Santiago, Cruz, Luna and Sullivan but not Tartaglione (T3178). It contended that once investigator Young decided Tartaglione was the culprit, he coerced the witnesses into confirming his version (T3166-3170).

Although Cruz, Biggs and Sullivan all admitted their involvement in killing the four victims, they received drastically reduced sentences. For example, Cruz received time served and was allowed to stay in the U.S. along with his family, despite being undocumented.

After trial Tartaglione sought a new trial under F.R.Cr.P.Rule 33, alleging misconduct and perjury. Without a hearing, Judge Karas denied the motion and sentenced appellant to four consecutive mandatory life imprisonment terms.

Pretrial, the court held two years' of *ex parte* proceedings to determine whether trial counsel had unwaivable conflicts of interest. The court ruled the conflicts were waivable.

---

[2] Biggs testified that, in the recent past, he had strangled another man until he lost consciousness (T2272).

**The Trial**

**Jury Selection**

***A.*** ***Pre-trial Coverage and Gossip***

**1. Pre-trial Publicity**

Impaneling an unbiased jury was made far more challenging by the extent and nature of pretrial coverage. As a New York Times' letter to the trial judge described it,

> the immense public interest in these proceeding is worth highlighting. Even before Mr. Tartaglione became Jeffrey Epstein's cellmate, there was substantial public attention on his case because of the nature of the charges against him and the prosecutors' decision to seek the death penalty. Mr. Epstein's attempted suicide, which occurred while Mr. Tartaglione was his cellmate, roused even greater interest in his case. Put simply, the public is watching this case (A59-60).[3]

The prosecution added fuel to the fire by making derogatory pre-trial comments about Tartaglione. For example, the S.D.N.Y. U.S. Attorney stated:

> While all murders tear at the fabric of our communities, when the alleged perpetrator of a gangland-style,

---

[3] Also arousing public interest was the widely publicized suicide of alleged co-conspirator, Gerard Benderoth. *See, e.g., Eli Rosenberg & William K. Rashbaum*, <u>New Details Emerge in Murder Case After Ex-Officer's Suicide</u>, New York Times, March 9, 2017, available at <u>https://www.ny-times.com/2017/03/09/nyregion/gerard-benderoth-suicide-drug-plot.html.</u>

> quadruple homicide is a former police officer, that strikes at the heart of civilized society. (DOJ press release, A61).[4]

This was echoed by the FBI's Assistant Director-in-Charge:

> The despicable acts of murder are more egregious in this case because the alleged murderer, a former police officer, once swore to serve and protect people from harm. (A61).

Other law enforcement figures made even more inflammatory statements presuming appellant's guilt. For example, Village of Chester's Police Chief said:

> I was appalled. I couldn't believe it. ... It's just so despicable and heinous you know that a guy who has taken an oath and sworn to protect the people turned around and just because he's no longer a police officer then turns to these kinds of things, whether it's drugs or money, or murder. CBS News, *Retired Police Officer Accused of Killing 4 Amid Cocaine Conspiracy* (A65).

### 2. Gossip About Appellant During *Voir Dire*

On Day Two of jury selection, the trial court learned that some prospective jurors were spreading and/or hearing rumors about appellant. One told the court:

> This morning while we were waiting in line to come in, I heard another potential juror mention a derogatory term against the defendant. ... [S]he said ... [a] law enforcement person from Yonkers told her that the defendant was, quote, unquote, a scum bag and he lied on his police application and that he deserved everything he gets (T565-566).[5]

---

[4] The U.S. Attorney's comments were dutifully reported in the press. *See, e.g.,* Retired Police Officer Accused of Killing 4 Amid Cocaine Conspiracy, CBS New York, Dec. 20, 2016, among other publications (A65).

[5] Because the juror said she would not be affected by the comment, the trial court refused to excuse her (T591).

Another prospective juror recounted:

> ... I was just telling my cousin, oh, I had to go to jury duty today. ... And she was like my mother-in-law saw him, you know, lose his temper one time and he was smashing pumpkins and he has a temper on him (T586-587).[6]

### 3. *Voir Dire* Questions Regarding Knowledge of the Case

The prospective jurors received a written questionnaire calling for "yes-no" answers. The court told them there could be "follow-up questions" if there were any "yes answers" (T9, 18). One question asked:

> Whether you believe you have knowledge, including based on firsthand knowledge, any media reports, or otherwise, of the charges in the indictment that I have described them or if you have any knowledge of Mr. Tartaglione (T21).

Many venirepersons acknowledged hearing various reports about Tartaglione. *See* T45-47,69,110,113,173,285,455,463,576,582,583,583-86,592,599,601,631.[7]

Most of those acknowledgements came only after the court learned of, and individually questioned them, about other derogatory remarks circulating among the jurors.

---

[6] The court declined to excuse the prospective juror for cause, given "the strength of her answer" (A587). The defense subsequently exercised a peremptory challenge to excuse her (T646).

[7] None of them said they would be affected by the reports, so they were not excused on that basis.

The defense moved to dismiss the panel, arguing in part that the court's *de minimis* treatment of the questionnaire's questions — asking simply if there were any 'yes' — was inadequate to uncover possible biases (T330-331).[8] The trial court denied the motion.

### B. The Trial Judge's Response to a Potential Juror's Expression of Bias

During the first day of jury selection, a venireperson told the court her husband was a former New York City police officer. When asked if it would affect her ability to be fair and impartial, she replied: "It would" (T189). The court then asked if she would be biased against law enforcement because of her husband's work, she responded: "I would be biased ... [a]gainst the defendant because of the charges brought against him" (T189-190). She also said that she was nervous and finding it difficult to express herself (T190).

The judge asked if it had anything to do with police testimony. The potential juror responded:

> I guess what I'm trying to say is that I don't know if I could be fair and impartial, knowing the kind of work my husband did, and knowing the work that the defendant has done (T191).

---

[8] The government argued that the trial court had "ample discretion in determining how best to conduct *voir dire*" and that the process the judge used was "pretty standard" for jury selection in the district (T336-337).

The trial judge pressed her for a more acceptable explanation. then interrupted mid-response, expressing skepticism and disapproval:

> COURT: ... I don't understand how the fact your husband worked in law enforcement two decades ago would cause you to not understand or even respect this fundamental notion that people —
>
> A: It's not that I don't have respect for it. It's just I know my biases. I know that ——
>
> COURT: But the bias isn't respectful of the notion of presumed innocent until proven guilty.
>
> A: You're right. That's correct.
>
> COURT: So I'm just trying to understand how it is that you have this so-called bias.
>
> A: I'm sorry. I can't explain myself.
>
> COURT: Well, I'm just trying to get you to explain yourself. Because if you can agree with me you don't know anything about Mr. Tartaglione. If you can agree with me you don't know anything about what the evidence in this case will or will not be, ... how can you say that somehow that the government doesn't have to prove guilt beyond a reasonable doubt?
>
> A: No, I haven't said that at all.... You're asking these questions, I'm trying to be honest. I could say, oh, no, I'm fine, yes, to everything and I wouldn't be a suitable juror if I weren't honest with you.
> All I know about Mr. Tartaglione is that he was a former police officer.
>
> COURT: Yes.

10

A:        And he is being charged with the crimes as indicated on this ——

COURT:    That's it. That's all you know. That's all you know.

So is there ever a case you could imagine that you think you could respect the presumption of innocence?

A:        I don't know. This is the first time I've ever been ——

COURT:    But why not? Why not?

A:        I've never sat in a jury selection process before. This is the first time I've ever done this.

COURT:    Right, but I guess what I'm trying to understand is this is now causing all of us to think about it. I mean, when we get the call to jury service and sometimes these concepts are introduced, you tell me you can understand the presumption of innocence, and respect the notion that nobody should be convicted unless the jury unanimously finds that the government's proved guilt beyond a reasonable doubt, and yet you're telling me you would somehow prejudge this case.

A:        I don't know that I would prejudge it. I'm just saying this is my bias. This is all I am ——

COURT:    I'm trying to under what the bias is (T192-194).

Despite her obvious discomfort, the juror persevered:

A:        I just think that police officers, we really should hold them to a higher standard, based on their serving and protecting. They hold a badge. They've been hired

11

to enforce the law,[9] and I just resent when these things happen and is ——

COURT:    But you ... don't know what has happened.

A:    That's true (T192-194).

Having made clear to the entire jury pool his disdain for her explanation, the judge continued:

COURT:    You have no idea if there's going to be enough proof that Mr. Tartaglione did anything. You have no idea.

A:    You're right.

COURT:    So I just, for the life of me, I'm trying to understand how it is you're articulating this notion that, what, because Mr. Tartaglione was once a police officer, therefore the accusations which are backed up, presumably, by the testimony of law enforcement officers, means that, what, he doesn't get the presumption of innocence?

A:    No, I didn't say that.

COURT:    So then I'm trying to understand how you can prejudge the case.

A:    I'm not prejudging it I'm being honest with you about my own biases is all.

COURT:    Well, but the bias is prejudging the case. The bias is telling me that you can't keep an open mind and decide this case based on the evidence or lack of evidence.

A:    Then maybe I can't.

---

[9] Her comments actually mirrored those expressed by the S.D.N.Y. U.S. Attorney, the FBI Assistant Director-in-Charge, and Chester Village Police Chief. *See* pp. 6-7, *ante.*

COURT:     But I'm trying to understand why not.

A:     I'm sorry. I just can't articulate it.

COURT:     Well, but I'm having a hard time with that.

A:     So am I.

COURT:     It's not a complicated concept, so I'm trying to understand why it is you think you can't keep an open mind and decide this case based solely on the evidence or lack of evidence. That's it.

A:     I don't have an answer.

COURT:     So that's it. You're going to be somebody who's not going to keep an open mind? If it were a civil case, if it were a civil case and a police officer were accused of wrongdoing, using excessive force, planting evidence, right, and it was somebody who says that I was the victim of misconduct by a police officer, could you keep an open mind about a case like that?

A:     **I don't know**.

COURT:     Why not? Why couldn't you keep an open mind about a case like that?

A:     **I guess I could**.

COURT:     So if you can keep an open mind in a case where, in that situation somebody would be accusing a law enforcement officer of wrongdoing, and not prejudge the case, how is it you can't keep the same open mind in this case

A:     I don't know. I just can't.

COURT:     But why?

13

> A:           I just can't, your Honor (T195-196)(*emphasis added*).

It was obvious that the juror was not going to give the answer the judge wanted; nonetheless, he continued to press her in open court. In so doing, he also mischaracterized her earlier responses:

> COURT:    But you can't tell me what the difference is?
>
> A:           I guess what I'm reading here, what the charges that have been brought to him; drugs, murder.
>
> COURT:    So what? Those are just accusations. In the hypothetical I gave to you there would be accusations against a police officer using excessive force or planting evidence. Those are just the accusations. They'd have to be proven before anybody could say they were true.
>            *And yet you can keep an open mind in a case involving those type of accusations, but you say you can't here.* I'm wondering why?
>
> A:    I'm sorry I was honest with you, your Honor. I don't want to hold the process up anymore, but I can't change my answer now, because I already told you how I felt. So I just don't see any value in continuing the ——
>
> COURT:    Oh, no, see, I get to decide that.
>
> A:           I'm sorry, your Honor.
>
> COURT:    I decide whether or not we continue with the questions.
>            And I'm trying to understand, you know, people here take an oath and answer the questions in good faith because jury service is something that's very important in our country.

14

> A:      I know.
>
> COURT:     It's a civic duty and it's a responsibility we all have. And I'm trying to understand why it is you can't even articulate a so-called bias in this case without knowing anything about the evidence in this case (T196-198)(*emphasis added*).

The following day, defense counsel argued that the court's questioning of this venireperson violated appellant's constitutional rights and "crossed a line" by "potentially intimidating the panel," causing "other jurors [to] be reluctant to express a similar bias" (T331-332).[10]

The court denied appellant's motion, concluding its questioning was "entirely appropriate," and a genuine effort to understand the basis for the juror's bias (T343-344). Contradictorily, the judge said he was trying to ferret out, and hopefully embarrass, venirepersons who were simply trying to get out of jury duty:

> [A] follow-up of a juror who has an initial expression of a bias ... is I think not only not inappropriate, but I think it's entirely appropriate. And there are jurors who sometimes give it a go to say something they think will get them out of jury service. There are people who Google this stuff, how do you get out of jury service, before they show up.
> ... [T]here is certainly a line that judges can't cross, but I think it's appropriate for judges to inquire as to whether the person has a belief or otherwise is expressing a bona fide issue that might require excusal for cause.
> And for a lot of these folks, they're speaking in public, which makes them nervous. It's their first jury

---

[10] In support, defense counsel cited U.S. v. Rowe, 106 F.3d 1226 (5th Cir. 1997). The prosecutor argued *Rowe* was inapt because, there, the prospective juror was "essentially punished by the court's remarks" (T333).

15

experience. That makes them nervous. There are some jurors who I think are a little surprised when a judge asks a follow-up question because they figure, well, I'll just throw this out. You know, my lawyer friend told me if I just say X, I can get out of the jury. And it's been my experience that when they have to defend it, they then get embarrassed. I think appropriately so, and say, you know what? I'm fine. I'm good. I can do this. They gave it a go. It was not a good-faith answer. But when they're pressed on it, they say I can keep an open mind or I don't have this bias or whatever it is.

And sometimes there are jurors who ... [are related to law enforcement officers and] just think cops always tell the truth, and they believe that genuinely, but it doesn't mean that a follow-up isn't appropriate.

With Ms. Rivera, she couldn't articulate. You'll recall she changed her view as to the bias. Right? And then when she changed her view and I said, wait, I'm trying to understand what the basis is and **I asked her a hypothetical about a civil case against a law enforcement officer who's accused of using excessive force or doing something that's inappropriate, would she have the same bias and she said no.**[11] And then it really didn't make any sense. So I was trying to understand what the basis of the bias was. And when it was clear -- I mean, she kept saying, well, I'm just telling the truth and I'm like, well, you haven't answered the question as to why you have this bias. I don't think there's anything inappropriate about that. I would do it again. Because I really was trying to understand what the bias was or if it was a bona fide bias. (T343-345)(*emphasis added*).[12]

---

[11] She did not say "no." Asked if she could keep an open mind, she said "I don't know" and when pressed said "I guess I could." (T196)

[12] Elsewhere, the trial judge expressed his dislike and distrust for this potential juror. *See* T254 (describing her as "**the person who is** biased, but not biased, and is otherwise **full of hooey**, but whatever. I have no patience for that")(*emphasis added*); T307 ("And you see the contagion theory. ... I'm telling you, [I'm] gonna remember her forever").

16

## C. Other Challenges for Cause

During *voir dire,* one juror stated that some friends from the late '90s were friends with Tartaglione. The juror still saw them "from time to time" (T115). He did not personally know appellant although he had "seen him around;" he never actually spoken to Tartaglione except possibly to say "hi" in the late '90's (T115-116, 361).

The juror's friends told him "about the court case in 2016" but did not express any opinions about appellant's guilt or innocence (T361-362). He was a "hundred percent" sure he could be "fair and impartial in this case and decide it based on the evidence or lack of evidence" (T362).

The government challenged him for cause, because" they have friends in common" and "have been in social settings together" (T310). The trial court granted the government's challenge, even though the prospective juror had been resolute in saying it would not affect him at all.

Another potential juror was challenged by the government because she told the court that she "took a hit for petty larceny" to protect a young companion:

> I was shopping with a young girl, didn't know she threw a bunch of junk in the cart. I pushed the cart out and I took the guilty plea because...if she had that guilty charge, she would not have been able to take the [nursing] boards (T146-147).

17

The government sought dismissal for cause because "she admitted that she lied under oath in a court proceeding, took a guilty plea that she said that she didn't actually do" (311). The defense objected: the fact that a panel member "once did something she shouldn't have" should not disqualify her (T312). The court concluded that "she technically told the truth because she said that she was the one who pushed...the cart out with the stolen goods" (T311), but nonetheless struck the juror for cause (T317).[13]

By contrast, it rejected a defense for-cause challenge of a potential juror who indicated bias in favor of law enforcement witnesses (T521). When asked if he would be more likely to believe a law enforcement witness, the juror responded that, although he believed he could be fair and would keep an open mind, he might give a law enforcement witness "a slight advantage" (T428-429).

### The Government's Case

The government's case consisted primarily of the testimony of:

- three cooperating witnesses (**Mario Cruz**, **Jason Sullivan**, and **Joseph Briggs**);
- victims' family members;
- expert FBI witnesses: a computer expert, fingerprint analysts, a DNA analyst;

---

[13] The juror worked as a nurse in several New York prisons, where she would presumably have undergone background checks.

18

- a Medical Examiner;

- local, state and federal law enforcement witnesses.

Their testimony was accompanied by various documentary, forensic, video, and audio exhibits.

## Mario Cruz – The Vomiting Witness

Before his testimony, the prosecution informed the court and the defense it expected Cruz to vomit while on the stand: "every time Mr. Cruz has recounted a part of his testimony to me, he becomes physically ill. So we have put a trash can up at the witness stand. He always is able to continue right after, so I wanted to warn the Court (T1305).

When Cruz described the last time he spoke to Martin Luna before Luna's murder, he became ill, a fact which the prosecutor made sure to emphasize:

> Q: Mr. Cruz, do you need a break?
>
> A: No. No.
>
> Q: Mr. Cruz, let me ask you: Are you feeling physically ill? Mr. Cruz?
>
> A: I feel bad because of this whole problem.
>
> Q: Mr. Cruz, have you ever been able to describe everything that happened with Martin in 2016 without vomiting?
>
> A: No.

19

Q: Mr. Cruz, do you want us to take a break or should we keep going?

A. You can go ahead.

Q: Will you please let us know if you need to take a break?

A: No. It's okay. You can go ahead (T1381-1382).

After that, despite the government's earlier indication that the vomiting would be limited in scope, Cruz continued to throw up throughout his direct testimony. *See, e.g.,* T1404, T1455-1456.

The defense objected that "the vomiting [was] extraordinarily prejudicial," and stated it was considering moving for a mistrial (T1418). The court then ruled on the issue *sua sponte*:

> COURT: For what? Because he is having a physical reaction?
>
> DEFENSE COUNSEL: It is, in our view, it's extremely prejudicial, the witness up there vomiting in front of jury. Some jurors put a mask on who hadn't been previously wearing a mask. I'm not close enough to know whether or not there is a noticeable odor.
> But witnesses should testify when they are physically able to, not when they are—I mean, he's been vomiting I think almost all morning. We were told at the beginning of this that he vomited every time he talked about the portion of his testimony where he says he saw the blue tarp. But the vomiting has started first thing in the morning. Maybe he ate something that was bad or maybe he is just extraordinarily nervous. Maybe he is sick, but the impression that's been left to the jury, I think, is that it adds unfairly credibility to his testimony (T1419).

20

The court found that, since the vomiting could be caused by "a number of different possibilities,"[14] it was not prejudicial; counsel could "cross-examine him on why he is ill" and make any arguments in summation he deemed appropriate (T1419-1420).

The court also "noted for the record" that Cruz's vomit cans had been replaced twice "to prevent the odor from staying in the air," and stated it would get building maintenance to clean up any spillage (T1420). Instead of trying to ameliorate the impact of a highly emotional witness, the court instructed the prosecutor to be especially solicitous: "make sure the witness has enough water and tissues." *Id.*

Defense counsel requested a cautionary instruction. The government objected, arguing that it was the jury's job to assess the witness's demeanor, including "a physical reaction such as vomiting or becoming sick to their stomach" (T1422). It argued that there was "absolutely no basis in the law to instruct the jury that they should disregard part of a witness's demeanor in the middle of his testimony." *Id.*

The court denied the defense request:

> [A]n instruction is fraught with peril because no matter what I say it seems like it could be interpreted as tipping — you know, putting my thumb on the scale.
>
> Right now the jury is left to decide what they want to do with his testimony, and this is even — you know, this would be true certainly after a cross. They have been told and over again to keep an open mind. And you all can cross

---

[14] The court did not acknowledge the witness's own statement that it was his remorse which caused him to vomit. *See* p.19*, ante*; p.22, *post*.

him on the vomiting or not cross him on the vomiting, whatever you want to do; but I would think right now for me to say to the jury it could be any number of things, I don't know. I have no idea why he's vomiting. I'm not a doctor. I don't play one on TV. I didn't stay out last night, so I am going to stick to what I do. (T1423-1424).

The next morning, during Cruz's cross-examination, Cruz brought up his vomiting *sua sponte* as proof of his remorse:

Q: The truth is, though, you don't have any remorse for what happened to the victims, do you?

A: You think I have no remorse?

... I can't even swallow food. You know, I get a knot in my throat, and I throw up everything. And he knows very well that ever since that day when that happened, I have been throwing up non-stop (T1523).

When counsel noted that he had not vomited during cross-examination, Cruz said it was because he had not eaten since the night before (T1523).

During closing remarks, the government argued that Cruz's vomiting and crying, along with witness Joseph Biggs's sobbing throughout his own testimony, proved appellant's guilt:

[Y]ou watched these men testify. You saw Marcos Cruz vomit over and over again at the thought of what Martin had gone through, at what he had did, at the guilt he felt. You saw him cry repeatedly. You saw him hold his head in his hands. Marcos Cruz, with his second grade education, is not some trained actor who can vomit and cry on cue while reciting six hours of testimony. ... That's not acting. That's real.

22

> Joseph Biggs. You saw him break down sobbing as he relived the horror of what happened .... He was not just telling you some story. He was reliving it. He was there in the moment, and that's why he got so emotional. Again, [he] is not some Shakespearean actor who can sob on cue in order to strike the right moment. He was reliving the worst day of his life right in front of your eyes.
>
> **Their demeanor alone is enough for you to reject the defense theory entirely** (T3265-3266)(*emphasis added*).

During Cruz's sentencing, the government opined that Cruz's "demeanor alone was devastating evidence that we believe the jury credited...." U.S. v. Cruz, 16-cr-832, Dkt. #540, *Sentencing Transcript* at p.18. The trial court clearly agreed: before sentencing Cruz to time served for participating in a quadruple murder, it concluded that Cruz's emotional state in the courtroom was "*essential to the case.*" *Id.* at p.31.

## SUMMARY OF ARGUMENT

This case involves numerous evidentiary issues which share a common theme: the lower court's decisions regarding the admission and exclusion of evidence impermissibly tipped the scales in the government's favor. A similar pattern was evident throughout the jury selection process, and even after trial, in response to appellant's motion for a new trial.

The combined effect of the district court's remarkable generosity toward the government and its reflexive rejection of defense positions rendered appellant's trial fundamentally unfair.

## ARGUMENT

## POINT I

THE MANNER IN WHICH THE TRIAL COURT CONDUCTED VOIR DIRE DIS-COURAGED PANEL MEMBERS FROM DISCLOSING ANY BIASES AND FA-VORED THE GOVERNMENT, THUS DE-PRIVING APPELLANT OF A FAIR TRIAL

The right to an impartial jury is "the most priceless" safeguard of "individual liberty and of the dignity and worth of every man." Irvin v. Dowd, 366 U.S. 717, 721 (1961). An adequate *voir dire* is the primary mechanism for ensuring that right. Morgan *v.* Illinois, 504 U.S. 719, 729 (1992); Gomez v. U.S., 490 U.S. 858, 873 (1989).[15] In a highly publicized case such as this one — involving a quadruple mur-der, a defendant who was not only a former police officer but also the infamous Jeffrey Epstein's former cellmate — an efficacious *voir dire* was both singularly necessary and particularly challenging.

---

[15] The "conventional wisdom is that most trials are won or lost in jury selection." John Blume, Sheri Lynn Johnson, A. Brian Threlkeld, *Probing "Life Qualification" Through Expanded Voir dire,* 29 HOFSTRA L. REV. 1209 (2001).

24

The court below failed to meet that challenge. By relentlessly badgering a prospective juror who expressed a potential bias, and by doing so in open court, it all but guaranteed that at least some other panel members would be inhibited from revealing their biases. Not only did this impede appellant's ability to intelligently exercise his peremptory challenges, it also made it virtually impossible for this Court to knowledgeably conclude that Tartaglione's impaneled jury was free of bias. Moreover, by granting government challenges for cause where no bias was established, while denying defense challenges where bias could be implied or inferred, the trial court demonstrated its *own* bias, tainting the entire *voir dire* process. Accordingly, appellant's convictions must be reversed and the case remanded for retrial.

## 1.    <u>Standard of Review</u>

Where *voir dire* objections are preserved, claims of prospective jurors' actual bias are reviewed for an abuse of discretion. <u>U.S.</u> v. <u>Morales</u>, 185 F.3d 74, 84 (2d Cir. 1999). Under that standard, the district court is given immense but not unlimited discretion, *see, e.g.,* <u>U.S.</u> v. <u>Nieves</u>, 58 F.4th 623, 631 (2d Cir. 2023). To honor a defendant's Sixth Amendment right to a fair trial, the lower court's discretion must be thoroughly reviewed and, if the *voir dire* is found to be "[in]adequate to identify unqualified jurors," it must be deemed fundamentally unfair. <u>U.S.</u> v. <u>Nieves,</u> *supra* at 633. *See also* <u>U.S.</u> v. <u>Kelly</u>, 128 F.4th 387, 421 (2d Cir. 2025); <u>U.S.</u> v. <u>Mensah</u>, 110 F.4th 510, 55 (2d Cir. 2024).

25

The abuse-of-discretion standard is appropriate because a finding of actual bias "is a factual determination uniquely within the province of the trial court." U.S. v. Quinones, 511 F. 3d 289, 304 (2nd Cir. 2007). The same reasoning applies, at least in part, to 'inferable bias,' *i.e.,* where facts disclosed by a juror bespeak a significant risk of partiality, justifying but not *mandating* excusing a juror for cause. *See, e.g.,* U.S. v. Nieves, 58 F.4th at 632.

By contrast, the test for implied bias is an objective one.[16] Implied bias is found where the relationship between the venireperson and some aspect of the case is such that it is highly unlikely that the average person could remain impartial. *See, e.g.,* U.S. v. Haynes, 398 F.2d 980, 983-834 (2d Cir. 1968). In other words, "[i]mplied bias is determined as a matter of law" and attributed to a prospective juror regardless of actual partiality. U.S. v. Torres, 128 F.3d 38, 45 (2d Cir. 1997), *cert. denied,* 523 U.S. 1065 (1998). As a result, it is reviewed under a less deferential standard, *i.e., de novo* review. *See, e.g.,* U.S. v. Gonzalez, 214 F.3d 1109, 112 (9th Cir. 2000). *See also*, Hunley v. Godinez, 975 F.2d 316, 318-319 (7th Cir. 1992)( existence of implied bias is "a question of law").

---

[16] "[I]n adjudging a claim of *implied* jury bias [the trial court] must determine whether an average man in the position of the juror in controversy would be prejudiced. Whereas, in reviewing a claim of *actual* jury bias, the Court must determine whether the evidence produced supports the conclusion that the juror was *in fact* partial." Phillips v. Smith, 485 F.Supp.3d 1365, 1370 (S.D.N.Y. 1980)(*emphasis added*).

Since the *voir dire* process below thwarted rather than uncovered potential biases, it is impossible to know whether a properly conducted *voir dire* would have revealed actual, implied, or inferable biases. Therefore, it should be reviewed *de novo.*

**2.      The District Court Tainted the *Venire* by its Treatment of a Panelist who Expressed Bias**

The "obligation to impanel an impartial jury lies in the first instance with the trial judge," <u>Rosales-Lopez</u> v. <u>U.S.</u>, 451 U.S. 182, 189 (1981), an obligation he satisfies by engaging in a process which ferrets out venirepersons' biases and prejudices.  <u>U.S.</u> v. <u>Torres</u>, 128 F.3d at 43. *See also* <u>U.S.</u> v. <u>McCoy</u>, 995 F.3d 32, 48 (2d Cir. 2021); <u>U.S.</u> v. <u>Parse</u>, 789 F.3d 83, 1000 (2d Cir. 2015). To do this, the judge must "open a dialog with prospective jurors in a way that encourages meaningful self-disclosure."  Frank P. Andreano, *Voir Dire: New Research Challenges Old Assumptions,* 95 ILL. B. J. 474, 477 (2007). *See also* <u>Aldridge</u> v. <u>U.S.</u>, 283 U.S. 308, 313-314 (1931).

Asking people to admit to their biases and/or prejudices is no small thing, particularly to an authority figure such as a judge. It is harder still in a public and unfamiliar setting such as a courtroom. Nancy S. Marder, *Juror Bias, Voir Dire, and the Judge-Jury Relationship*, 90 CHI-KENT L.REV. 927, 933 (2015).  It would be

27

even harder to do so before a judge who has already expressed suspicion and disapproval over anther panelist's disclosures.

This Court has long recognized that potential jurors may be less candid about questions about their beliefs and attitudes in front of strangers in a group setting *See* U.S. v. Colabella, 448 F.2d 1299 (2d Cir. 1971). Thus, particularly where a trial judge expresses "displeasure" with a prospective juror's potential prejudice, this Court strongly favors questioning that juror *in camera:*

> [I]t would be advisable for the judge, soon after there is an indication that a juror will claim he is biased (or that the judge is prejudiced), to proceed thereafter *in camera,* [where] the judge can conduct his examination freely, without the danger that any of his *own* comments will affect other jurors.

*Id.* at. 1304. *See also* Kimba M. Wood, *Reexamining the Access Doctrine*, 69 S.CAL. L. REV. 1105, 1119 (1996)("The more intimate setting of the robing room is far more conducive for probing bias").  The *Colabella* Court instructed trial judges to "take pains to be scrupulously impartial. **In no event should [they] indicate any personal displeasure**." *Id.* (*emphasis added*). *See also* U.S. v. Rowe, 106 F.3d 1226, 1228-1230 (5th Cir. 1997)(defendant had inadequate opportunity to identify and remove biased jurors where court had so intimidated panel members that their answers could not be trusted as authentic).

Here, the trial judge openly expressed his personal displeasure with a prospective juror who said she would have difficulty being impartial. He questioned her in

an aggressive, contemptuous manner, virtually guaranteeing that some other panel members would be disinclined to admit to their own biases.

As soon as the juror said that her husband's former job as a police officer made it difficult for her to be impartial, the court began to disparage her response, saying it was not "respectful of the notion of presumed innocent," that she did "not understand or even respect this fundamental notion..." (T192-194). The judge belittled her explanation that she was nervous and having a hard time articulating her thoughts, saying: "[i]t's not a complicated concept" (T196).[17] The judge made clear his belief that she was being untruthful, describing her doubts about her impartiality as a "**so-called** bias" (T198). *Compare, e.g.,* U.S. v. Lawes, 292 F.3d 123, 131 (2d Cir. 2002)(noting approvingly when a "potential juror stated during voir dire that she might be biased toward the police because her husband was a state trooper, the district court immediately dismissed her").

The trial judge had no doubt that the juror was was "full of hooey," falsely claiming bias in order to avoid serving on the jury (T254).[18]  His aggressive

---

[17] Additionally, the judge confronted her with an irrelevant and confusing hypothetical about being a juror in a civil case, *see* pp. 13-14, *ante*. It is not at all clear that she or the other venirepersons understood the difference between civil and criminal cases or could even follow the fact pattern he was positing. Nonetheless, he relied on it as proof that she was not making sense or was not being truthful. To make his point, he mischaracterized her response as saying she could be impartial in that hypothetical civil case, whereas she actually said "I don't know" (T195-196).

[18] He concluded that two other potential jurors were lying to avoid jury duty. As to one of them, he stated: "This punk was trying to get out of jury service" (T319). A third venireperson who said she would be more likely to believe law enforcement witnesses, was, the judge concluded, also

29

questioning was geared toward calling her out on her presumed lie, rather than helping her articulate what she thought was her bias.

The judge may well have been right that she was not actually biased; some people do not want to serve on a jury, particularly in such a high-profile case. But it is equally if not more likely that she was being truthful, and simply nervous and unaccustomed to being the center of attention. In short, her difficulty in precisely articulating the underlying reason(s) for her concerns did not justify the judge's certainty that she was lying:

> Some jurors, probably the minority, lie purposefully. More often, jurors fail to disclose pertinent information because of privacy concerns or other factors. Still others may not recognize [or understand] their own biases.
>
> Sometimes prospective jurors do not plan to deceive the judge and attorneys; instead, their false disclosure is due to their overestimation or underestimation of their attitudes and biases. ...Others are so concerned with the pressure to be an impartial juror that they do not think that they are well-suited enough for the task, whether or not they had any experiences related to the case that would compromise their impartiality.

Valerie P. Hans & Alayna Jehle, *Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection*, 78 Chi.Kent L. Rev. 1179, 1194 (2003)(*citations omitted*). *See also* Tracy L. Treger, *One Jury*

---

lying: "She's a juror telling us she doesn't want to be on the jury. That's what this was all about" (T627).

*Indivisible: A Group Dynamics Approach to Voir Dire,* 68 CHI. KENT. L. REV. 549, 551 (1992)("a juror may intentionally lie, but inaccuracies may also reflect the fact that some jurors are intimidated by the questioning process and have difficulty producing the correct response").

This judge seemed intent on either proving the juror was lying or getting her to change her answer, rather than trying to understand why she felt she could not be impartial. In fact, the questioning of this juror serves as an exemplar of how even a well-meaning and experienced trial judge can abuse his discretion in the *voir dire* context:

> Even when prospective jurors are able to recognize their biases and disclose them, the judge may still elicit a false response that is more in line with the desirable answer. If a judge asks if the prospective juror could be impartial and the prospective juror replies no, the judge may continue that it is the juror's duty to follow the law and ask the question again. Prospective jurors may give in to the pressure to comply and say they can be impartial, even though their real feelings have not changed. The judge's approval is important to a lot of prospective jurors and many will alter their responses or hide certain attitudes in order to be perceived favorably.

Hans & Jehle, *supra* at p.1194. As two jury-selection researchers explained:

> When jurors say something to suggest a bias of any sort, judges often attempt to rehabilitate that juror. Rehabilitation is generally not effective at mitigating bias, however, and typically involves trying to get a juror to walk back earlier statements rather than probing them further.

Barbara O'Brien & Catherine M. Grosso, *Judges, Lawyers, and Willing Jurors: A Tale of Two Jury Selections*, 98 Chi.-Kent L. Rev. 111, 116 (2024).

Regardless of the judge's reasons for such a prolonged interrogation of a potential juror, it certainly risked discouraging other prospective jurors from responding candidly and openly:

> Consider Juror A with a relevant experience they should disclose to the court and counsel. Before Juror A is called upon, they witness Juror B acknowledge an experience that results in Juror B being subjected to lengthy additional questioning. By observing the exchange between Juror B and the questioning [judge], Juror A recognizes answering affirmatively leads to unwanted questioning, thus encouraging Juror A to underreport or abstain from acknowledging a potential bias.

Joshua A. Haby, *The Effect of Voir Dire Variations on Juror Disclosures*, DISSERTATIONS AND DOCTORAL DOCUMENTS FROM UNIVERSITY OF NEBRASKA-LINCOLN at p.43(2025).

Here, there were undoubtedly other panel members who shared some of the feelings expressed by the juror, particularly her nervousness and anxiety: "During voir dire, prospective jurors may experience nervousness, embarrassment, or apprehension when they realize that the judge and attorneys possess the power to determine if they are fit to serve on the jury or when they acknowledge the grave responsibility of their duty." Goldstein, Alan M. *Handbook of Psychology: Volume 11 Forensic Psychology* at p.164 (John Wiley & Sons, eds. 2003). Psychological/legal

research demonstrates that some jurors try to alleviate that anxiety by "report[ing] that they could set aside their predispositions and biases when evaluating the trial evidence even if they truly believe that it would be difficult or impossible to do so." *Id.*[19] After watching how this potential juror was treated, others must have reasonably assumed that being forthcoming would come at their own personal cost and opted to give the trial judge what he so clearly wanted to hear.

Not all prospective jurors would be intimidated about admitting their biases; in fact, some panel members here were clearly forthcoming notwithstanding that cost. This makes sense, since jury pools are representative cross-sections of the community, and include people with vast differences in experiences, personalities, and perspectives. Some will be confident, articulate and familiar with the judicial system. Others will be shy, insecure, and unaccustomed to public speaking. The fact that some prospective jurors brought up biases despite the grilling the other juror had undergone reveals nothing about the impact the questioning had on other members of the venire.[20]

---

[19] This is more likely with a more disapproving trial judge: "Some judges... are notorious for quizzing the venire using a demanding and impatient demeanor. ... In voir dire, expectancy effects may occur when prospective jurors receive verbal or nonverbal cues from judges and/or attorneys, inadvertently guiding them to respond in a socially desirable manner." *Id .*

[20] The prosecutor argued that one prospective juror's admission of bias established that the venire had not been intimidated by this questioning (T332). The defense responded: "[A]pparently *that* juror wasn't affected, as far as we know. We don't know what affect it had on *other* jurors" (T338)(*emphasis added*).

33

Finally, by pursuing such extensive and judgmental questioning in open court, the trial judge ignored this Court's admonition to "question [a] prospective juror out of the presence of other prospective jurors" when demonstrating "displeasure with those who were asserting they had prejudged the case." <u>U.S.</u> v. <u>Colabella</u>, 448 F.2d at 1304.

In short, the trial judge failed in its obligation to conduct a *voir dire* which was adequate to identify unqualified jurors. By "discourage[ing] the prospective jurors from being truthful, he simultaneously destroy[ed] the purpose of the voir dire and erode[d] the foundation upon which a fair and impartial jury [could] be selected" <u>Price</u> v. <u>Texas</u>, 626 S.W.2d 833, 835 (Tex. Appp. 1981).

**3. <u>By granting government challenges for cause without an adequate showing of bias while denying a defense challenge despite evident or inferable prejudice, the trial court failed to conduct the *voir dire* in an even-handed manner</u>**

The trial judge did not use the same standard to weigh challenges from both the defense and the government. For example, the government challenged a prospective juror who told the court she had pleaded guilty to petty larceny nearly a decade earlier in order to protect a companion. *See p.*17, *ante.* The court asked about the circumstances of her plea:

> COURT:     When you took the plea, did the judge put you under oath and say you had to tell the truth?
>
> PROSPECTIVE JUROR:     Yup.

COURT: And you didn't tell the truth?

PROSPECTIVE JUROR: Well, I said I pushed the cart out of the store, which I did.

COURT: Technically you did.

PROSPECTIVE JUROR: I pushed the cart out of the store.

COURT: With the implication that you pushed the cart knowing that it had this stuff in it?

PROSPECTIVE JUROR: I didn't indicate either way I knew anything was in there. I said I pushed the cart out of the store and it had stuff in it (T147).

The government challenged her for cause, arguing that she "admitted to your Honor" that she "lied under oath" even though "she technically told the truth" (T311-312). It argued that this disqualified her because "we don't know whether she's telling the truth now, and we also want to find people who are going to be able to follow your instructions" (T313).

While acknowledging that she "technically told the truth because she was the one who pushed...the cart out with the stolen goods" (T311), the court granted the government's challenge over defense objection. It concluded that she "definitely lied under oath because she was admitting to a crime that she said she didn't commit" (T313). The court had no additional information regarding the circumstances of the

35

juror's previous plea. Since petty larceny is a misdemeanor offense,[21] it is unlikely that the plea colloquy was particularly fulsome. Moreover, as the defense argued, for all the trial court knew she may have entered an *Alford* plea (T317).

Nothing in the juror's disclosure provided a valid basis for excusing her for cause. There was no indication that the juror had been dishonest, intentionally or otherwise, when she took the plea a decade earlier. [22] *See generally*, U.S. v. Greer, 998 F.Supp.3d 399, 407 (D. Vt. 1998) *aff'd in part and vacated in part on other grounds,* 285 F. 3d 158 (2d Cir. 2002) ("The Court will not attribute a malicious design to a juror where the evidence does not indicate one"). *See also* McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984)("The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial").

Even if there *had* been such evidence, telling a lie many years earlier did not indicate that she could not be impartial in this case. Only "a lie which demonstrates *both* dishonestly *and* partiality on the part of the juror" will justify dismissal. U.S. v. Greer, 285 F.3d 158, 173 (2d Cir. 2002)(*emphasis added*).

---

[21] N.Y. PENAL CODE §155.25.

[22] Moreover, since the juror worked as a nurse in several New York prisons, she would presumably have undergone several background checks.

There was no reason to believe that she was being anything but forthright, that her previous guilty plea demonstrated any impartiality on the juror's part in this case. Therefore, she was improperly dismissed for cause.

The government also challenged for cause a venireperson who had some friends in common with Tartaglione. *See* pp. 16-17, *ante.* The juror did not personally know appellant; at most, he may have met him in passing over 25 years earlier. *Id.* The juror was "100%" sure he could be fair and impartial in this case despite that tangential acquaintanceship, but the trial court, over defense objection, nonetheless dismissed him for cause.

Again, this for-cause dismissal was unjustified: "[I]]t has never been supposed that mere acquaintance with those involved in a criminal case was by itself a disqualification for jury duty." U.S. v. *ex rel.* Brown v. Smith, 306 F.2d 596, 604 (2d Cir. 1962). *See* U.S. v. Francis, 141 F.4th 90, 95 (3d Cir. 2025)("even if actually established, a juror's mere acquaintance with a party does not render a potential jury member unfit to serve on the jury"); U.S. v. Paradies, 98 F.3d 1266 (11th Cir. 1996)(improper to excuse jurors who acknowledged acquaintance with the defendant); U.S. v. Mensah, 110 F.4th 510, 526-527 (2d Cir.2024)(a juror's "mere acquaintanceship" with a witness "was too attenuated to compel a presumption of bias").

By contrast, the trial court refused a defense request to dismiss, or even to ask follow-up questions of a venireperson who admitted he might give law enforcement

37

witnesses "a slight advantage," while also agreeing to keep an open mind about witness credibility (T428-429, 520-521).[23] This was an abuse of discretion. *See, e.g.,* U.S. v. Nelson, 277 F.3d 164, 201 (2d Cir. 2002); U.S. v. Sithithongtham, 192 F.3d 119, 113 (8th Cir. 1999)(where juror said he "would probably give [law enforcement witnesses] the benefit of the doubt if something was questionable," but "could probably be fair and impartial," the court held: "Probably is not good enough").

As defense counsel argued: "[K]eeping an open mind is not responsive to the bias" (T520). The defense argued that, while the juror could listen to a law enforcement witness with "an open mind" and find that the witness was not credible, "the question is, is the bar higher to make that finding for a police officer" (T519).

\*              \*              \*

The trial court's inadequate and partisan *voir dire* process must be viewed in conjunction with the extensive negative publicity and rumors which were circulating among the venire about appellant. This raised a significant threat of precisely the type of prejudice which *voir dire* is designed to disclose:

---

[23] When asked "[A]re you more likely to believe [a] person just because they're a law enforcement officer as opposed to non-law enforcement officer?" the prospective juror responded: "**honestly, I think, yeah, they might get a slight advantage**" (T428)(*emphasis added*).

Even when asked directly whether he could "evaluate the credibility of a law enforcement officer just as you would any other witness?", the witness agreed to "keep an open mind" but did not retract his acknowledgement he might give a law enforcement officer a "slight advantage" (T429).

38

> The psycho-legal literature supports the Courts' contention that pretrial publicity biases jurors' decision making.
>
> ... Pretrial publicity fosters juror bias by...increasing source-memory errors for case information, as well as by arousing jurors' emotions, and causing pre-decisional distortion and prejudgment of guilt.

Gordon, Natalie, "*Improving the Accuracy of Juror Self-Reports of Bias During Rehabilitative Voir Dire,*" CUNY ACADEMIC WORKS (2021) at pp. 1, 5, https://academicworks.cuny.edu/gc_etds/4419. *See also* C. L. Ruva, S. E. Diaz Ortega, & K. A. O'Grady, *What Drives a Jury's Deliberation? The Influence of Pretrial Publicity and Jury Composition on Deliberation Slant and Content*, 28(1) PSYCHOLOGY, PUBLIC POLICY, AND LAW, 32 (2022), https://doi.org/10.1037/law000310 (jurors exposed to negative pretrial publicity about a defendant "have been found to rate evidence as more supportive of the prosecution").[24]

Under these circumstances, it was critical that the trial court question the venire in a thorough and neutral matter, but the *voir dire* here was neither. Accordingly, appellant's convictions must be reversed and a new trial ordered.

---

[24] The negative information/rumors that prospective jurors heard about Tartaglione ran the gamut: government officials decrying that he was "an alleged murderer [who] once swore to serve and protect people from harm," whose his acts "strike at the heart of civilized society," who was a "scumbag who lied on his police application and deserved everything he gets;" a rumor that he became explosively angry and smashed pumpkins; and reports that he was Jeffrey Epstein's cellmate. *See* pp. 6-8, *ante.*

## POINT II

THE TRIAL COURT DEPRIVED APPEL-
LANT OF A FAIR TRIAL BY FAILING TO
TAKE ANY CURATIVE ACTION AFTER
A GOVERNMENT WITNESS'S EX-
TRAORDINARY DISPLAY OF EMO-
TIONS

Marcos Cruz, a key government witness against appellant, vomited, cried and hyperventilated throughout his direct testimony. He testified that this was because he felt "so bad" about what had happened to the victims in this case. The prosecution told the jury: this "demeanor alone is enough for you to reject the defense theory entirely" (T3266). Before sentencing Cruz to time served for participating in the quadruple murder, the court stated:

> I think everybody who was in the courtroom those days will remember forever. Mr. Cruz was guilt-ridden. He was vomiting. He was crying. He was hyperventilating...
>
> ... [A]nd I agree that his demeanor ... [was] essential to the case. U.S. v. Cruz, 16-cr-832, *Sentencing*, at p.31

The court ignored the very real risk that Cruz's extraordinary display would "arouse the jury's passions to a point where they would act irrationally in reaching a verdict." U.S. v. Robinson, 566 F.2d 507, 514 (2d Cir. 1977). By failing to take steps to ameliorate that risk, the court below deprived appellant of a fair trial.

While a witness's demeanor may provide some clues as to whether he is pre-varicating, it should not be so used where, as here, it is so emotional that it "unfairly

40

excite[s] emotions against the defendant." U.S. v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).[25]

Federal Rules of Evidence, Rule 403, makes clear that evidence is unfairly prejudicial if it tends to induce "decision on a purely emotional basis." FED.R.EVID. 403, Notes of Advisory Committee. *See also* U.S. v. Smith, 534 F.3d 1211, 1219 (10th Cir. 2008)(evidence should be excluded if it "makes a conviction more likely because it provokes an emotional response in the jury"); U.S. v. Gamble, 290 Fed.Appx. 592, 595 (4th Cir. 2008)(court notes the "risk of arousing the emotions"); Westfield Ins. Co. v. Harris, 134 F.3d 608, 613 (4th Cir. 1998)( same).

When, as here, a witness's demeanor is highly emotional, the trial court must make a "conscientious assessment" of whether its probative value is substantially outweighed by the prejudicial tendency of the evidence to have an adverse effect upon the defendant. U.S. v. Figueroa, *supra.*

When confronted with a witness's emotional outburst, a court may order a mistrial or, more commonly, issue a cautionary instruction. In *State* v. *Alexis*, 185 A.3d 526, 531-532 (R.I. 2018), for example, where a witness began crying while

---

[25] Even without emotional outbursts, demeanor evidence should not assume an outsized role in credibility determinations. "People lying do not, as a matter of course, give it away in their demeanor." Anna S.P. Wong, *Looks Can Be Deceiving: The Irrelevance of Demeanor in Witness Assessments* 68 CRIM. L. QUARTERLY 345, 349 (2020). "[J]urors (like all of us) are incapable of extracting useful information about who someone 'really is' from self-presentation." Kiel Brennan-Marquez & Julia Simon-Kerr, *Judging Demeanor*, 109 Minn. L. Rev. 1503, 1505 (2025).

testifying, the judge gave the following balanced instruction, compassionate but assiduous in reminding the jurors of their responsibilities:

> [T]here [are] instances...that [are not] particularly pleasant, and I didn't want you to be distracted from your assigned responsibility simply because of things that you heard on the stand....
>
> ... [S]ympathy plays no part in the course of your deliberations. Obviously, [a witness] was upset to the extent that he may have engendered some sympathy from you. Understand that notwithstanding his sad feelings ..., that cannot be permitted to affect your judgment ....
>
> ... [Y]ou can't permit those things to inflame your passions so as to prevent your calm and dispassionate examination of the evidence and acceptance of the law that I will provide to you at the end of the case.
>
> Can all of you do that?

*Id.* at 532.

In innumerable cases, trial courts have dealt with emotional outbursts — often far less extreme than the vomiting/crying/hyperventilating that occurred here — by giving a cautionary instruction. *See, e.g.,* Heath v. LaValley, 11-cv-2962 (E.D.N.Y. 2014)(court gave "prompt curative instruction" after witness broke down crying); U.S. v. Shavers, 693 F.3d 363, 393 (3d Cir. 2012)(court instructed jury to disregard witness's outburst); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1302 (11th Cir. 2001)(after witness's emotional outburst, district court gave curative instructions and ultimately struck the testimony); Kutzner v. Johnson, 242 F.3d 605 (5th Cir.

42

2001)(after witness became "extremely upset," the judge instructed the jury not to be influenced by the witness's reaction); Whitehead v. Cowan, 263 F.3d 708, 723 (7th Cir. 2001)(cautionary instruction); U.S. v. Xavier, 2 F.3d 1281 (3rd Cir. 1993)(court instructed jury to ignore witness's emotional outbursts); Messer v. Kemp, 760 F.2d 1080 (11th Cir. 1985)(trial court twice instructed the jury to disregard emotional outburst and "inquired as to whether the outburst would in any way affect the jurors' judgment"); Finney v. State, 660 So.2d 674, 683 (Fla. 1995)(cautionary instruction); Richmond v. State, 791 S.W.2d 691, 693 (Ark. 1990)(court denied mistrial motion, but "admonished the jury not to consider [witness's] emotional outburst when deliberating"); Ducote v. Phelps, 07-374 (D.Del. 2010)( trial judge gave jury two cautionary instructions); Duncan v. State, 349 S.E.2d 699 (1986)(mistrial denied following witness's emotional outburst but jury was instructed to ignore the outburst).

Here, the trial court's refusal to give a cautionary instruction aligned with its belief that Cruz's theatrical display of emotional turmoil was "essential to the case." *See* p. 40, *ante*. That belief, however, was unsound. While the display may have (improperly) convinced the jury to convict appellant, it was anathema to a fair trial in the absence of a curative instruction.

Even if, as the prosecution argued and Cruz claimed, Cruz's display was caused by remorse and guilt over the murders, those emotions would have existed

43

whether he was telling the truth or lying about Tartaglione's guilt. For it was undisputed that Cruz himself *was* involved. The only difference between the parties' versions of the facts was whether Cruz *et al* committed the murders with or without Tartaglione. In either case, Cruz had ample reason to feel guilt and remorse; appellant's involvement or non-involvement had no logical bearing on Cruz's feelings of remorse. If anything, Tartaglione's innocence would give Cruz *more* reason to feel distraught, since that would mean that Cruz, as appellant alleged, played a larger role in his friend's murder. And if he was lying on the stand, his feelings of guilt would be magnified, since it would mean he was complicit in sending an innocent man to prison for life. In sum, Cruz's emotions did not indicate whether he was lying or not with respect to to the essential facts of the case against Tartaglione, nor did they indicate whether appellant was guilty or not. His emotional outburst was only "essential" to the case insofar as its prejudicial impact could lead the jury to convict on an improper basis.

The trial judge stated that he would not give a cautionary instruction for fear that he would be "putting [a] thumb on the scale." *See* p. 21, *ante.* But that is exactly what he did: he allowed the jury to see an hours-long emotional display that was so extreme that they would "remember it forever," *see* p. 41, *ante*; he permitted the government to argue on summation that Cruz's vomiting,  and Cruz's and Biggs's sobbing, was "enough for you to reject the defense theory entirely" (T3265-3266);

44

and he failed to take any steps to ameliorate the prejudicial impact of Cruz, not just crying, but continuously retching into a bucket. By his actions and inactions, the judge deprived appellant of a fair trial. Accordingly, appellant's convictions should be reversed and a new trial ordered.

## POINT III

> THE TRIAL COURT DEPRIVED APPELLANT OF A FAIR TRIAL BY IMPROPERLY: (A)(1) ADMITTING THE GOVERNMENT'S 'PROOF OF INTENT' EVIDENCE WHILE EXCLUDING EQUIVALENT DEFENSE EVIDENCE; (A)(2) ADMITTING 'THREAT' EVIDENCE AGAINST APPELLANT, WHILE EXCLUDING EQUIVALENT DAMAGING EVIDENCE AGAINST A KEY PROSECUTION WITNESS; (B)(1) ADMITTING DNA ANALYSES FROM NON-TESTIFYING BIOLOGISTS; AND (B)(2) ADMITTING UNRELIABLE DRIVE-TEST EVIDENCE DESPITE THE GOVERNMENT'S FAILURE TO PRESERVE UNDERLYING TEST DATA.

The court below made evidentiary errors of both inclusion and exclusion that collectively deprived Tartaglione of a fair trial and the right to present a defense.[26] It improperly excluded evidence the defense sought to present, while permitting the government to introduce prejudicial but unreliable or irrelevant evidence.

---

[26] "[T]he cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction." Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978). *See also* U.S. v. Al-Moayad, 545 F.3d 139, 178 (2d Cir. 2008); U.S. v. Zhong, 26 F.4th 536, 544 (2d Cir. 2022).

**Standard of Review**

This Court reviews admissibility of evidence at trial for abuse of discretion. U.S. v. Williams, 585 F.3d 707 (2d Cir. 2009). "A district court by definition abuses its discretion when it makes an error of law" or applies an incorrect standard. Koon v. U.S., 518 U.S. 81, 100 (1996); U.S. v. Figueroa, 548 F.3d 222, 226 (2d Cir. 2008). When an evidentiary error "directly implicates a defendant's constitutional right," this Court "review[s] that evidentiary ruling *de novo*." U.S. v. Al-Farekh, 956 F.3d 99, 114 (2d Cir. 2020).

**(A)**

*1. Statements of Future Intent*

If relevant, a declarant's out-of-court statement of future intent may be introduced to prove he acted in accordance with that intent. Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285 (1892); U.S. v. Best, 219 F.3d 192, 198 (2d Cir. 2000), *cert. denied,* 532 U.S. 1007 (2001); FED.R.EVID. 803(3).

Here, the trial court permitted Obdula Luna to testify that on the day her husband Urbano and the other victims disappeared, he asked her to lend her car to Martin Luna, because Urbano had asked Martin to "go feed the animals [at Hector's

46

farm]" (T949-950). The court rejected appellant's hearsay objection, agreeing with the prosecution that the testimony was a "[s]tatement of future intent" (T949).

The court ignored that this was a compound statement involving multiple levels of potential hearsay: it not only involved Urbano's statement to his wife, but also his previous statement to Martin. There was actually no "future intent" in the statement: Obdula did not say she intended to lend Martin her car and Martin did not say he intended to feed the animals. In addition, the trial court did not address much less find any independent proof that either Urbano or Martin acted in accordance with Urbano's statement. Nor did it address the compound nature of Obdula's testimony.[27]

The court responded differently to a similar issue during the defense case. Appellant called Ross Hall to testify about his delivery of a bulldozer to Tartaglione. Hall was prepared to testify that appellant told him he intended to use the vehicle to remove a pile of rocks and the pile was gone when Hall retrieved the bulldozer. On

---

[27] Obdula Luna's testimony included other hearsay statements that should have been excluded. For example:
- Yolanda called her and asked if she had any communication with Martin. Yolanda said she was trying but could not reach Martin. (T953);
- Obdula went back to the police station and the officer said he didn't have any news, but another officer said, "yes, wait, we found the car parked for a few days at the Chester Diner'" (T953);
- She ran into Don Hector's brother and told him what the police said. He said that he would accompany them to the Chester Diner where the car was and they went there. (T954).

its face, the proposed testimony was legally indistinguishable from Obdula's testimony: both expressed an intent to use a vehicle for a specific purpose. But the trial judge rejected counsel's claim that Hall's testimony went to Tartaglione's "future intent with respect to the equipment" and excluded the testimony (T2845-2846).

Hall's testimony "should have been admitted as a hearsay exception under Fed.R.Evid. 803(3)." U.S. v. Harris, 733 F.2d 994, 1004 (2d Cir. 1984). ). There was no discernible reason for admitting the out-of-court statements of one witness, and not those of another witness whose testimony fit even more comfortably within the Rule, except that one was offered by the government and the other by the defense.

Moreover, its exclusion significantly prejudiced appellant. Cooperating witnesses of suspect credibility testified that Tartaglione rented a bulldozer to bury the victims. Evidence that appellant had rented a bulldozer at around the same time the victims were allegedly buried was offered to corroborate them. However, Hall's testimony — that appellant intended to, and did, use the bulldozer to remove rocks — would have gone a long way to rebut that allegation. In short, the improper exclusion of Hall's testimony challenging the cooperators' testimony seriously impaired the defense case and cannot be deemed harmless. *See, e.g.,* U.S. v. Harris, *supra.*

## 2. *Threat Evidence*

The prosecution moved pre-trial to introduce evidence that during a March 2016 eviction proceeding, appellant told his landlord's attorney:

48

"I'm just concerned about that house. It would be a shame if something happened to that house. I'm just not sure about that furnace." The defendant then raised his voice and stated, "If you want to be a dick, I can be a dick" and further stated "you fucking pussy...." Govt's Motion *In Limine,* Dkt. No.396 at p.13.

The government argued this was admissible to "show both the defendant's financial desperation shortly before he killed Martin Luna and his rage at his financial situation" and thus would help "the jury to comprehend how someone could take such horrific actions against another human being." *Id.,* p.13-14.

The defense responded that the incident, "if true, appear[ed] to be nothing more than [a] passing expression[] of frustration[] during [a] legal dispute[]." Defense Response*,* Dkt. No.398 at p.10. Further, counsel suggested it was "only being offered to paint Mr. Tartaglione as a 'hot head' who has a propensity to snap and use violence." *Id.*

The defense disputed that it proved financial desperation, noting that Tartaglione received approximately $5,000 or more in monthly tax-free disability payments. Moreover, it did not establish the alleged volatility; rather, it was an expression of the frustration litigants in a landlord-tenant actions commonly feel. Defense Response #2 to Govt. Motion*,* Dkt. No.405 at p.13.

Counsel concluded that the statements were "on their face neither threats nor financially motivated. They could be either or both, but additional evidence was

49

needed to determine whether they are either...." *Defense Response #3, Dkt. No.417 at* p.9:

> [It] could be, for example, that the statements were expressions of frustration caused by his belief that the landlord had unfairly refused to allow him to purchase the subject property in an installment sales agreement or an option to buy exercisable at the end of the lease.... Also, the fact that in April 2016 Mr. Tartaglione deposited $12,000 (representing $3,000 rent per month) ... with the court is strong evidence that Mr. Tartaglione's...so-called threat did not reflect...financial desperation, a condition necessary to the statements being relevant to the Government's purpose. *Id.* at pp.9-10.[28]

The defense proffered appellant's letter to the judge who presided over the eviction proceeding. In it, Tartaglione was critical but civil about his landlord's handling of the property dispute. In the letter, appellant offered his landlord a substantial payment, hardly indicative of financial desperation or of an abiding rage. *See* Dkt. No.417-A.

Nonetheless, the trial court concluded that the threat evidence had "substantial" probative value and any risk of "undue prejudice" could be addressed by a curative instruction. 2/14/2023 Ruling, Dkt. No. 476 at pp. 100-101. *But see* U.S. v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)(limiting instruction "may lessen but does

---

[28] To prove its point, the defense gave a relatable example: "Customers routinely demonstrate frustration with telephone companies and credit card agencies when discussing their bills during recorded customer service telephone conversations. The frustrations are often nothing to do with financial desperation ...." *Id.* at p.10 n.2.

not invariably eliminate the risk of prejudice"). However, no curative instruction was given, either after the evidence was admitted or as part of the court's final charge to the jury.

The trial court abused its discretion by admitting threat evidence that bore little to no relation to the charges at hand. It's ruling did not weigh the government's need for the evidence or the risk that the jury would misuse it as propensity evidence.[29] This Court has warned of the risk "that the jury would misconstrue ... threats as evidence of [] propensity [for violence]." U.S. v. Munoz, No. 16-3890-cr. (2d Cir. 2019). There, as here "the district court's balancing did not seem to take that risk into consideration." *Id. See also* U.S. v. Williams, 596 F.2d 44, 50 (2d Cir.), *cert. denied,* 442 U.S. 946 (1979). Not only did the district court fail to weigh the risk of unfair prejudice, but it failed to give its promised limiting instruction.

The government's witnesses testified that appellant invested $200,000 into Martin Luna's cocaine project, which Luna had then stolen. Someone who has just had $200,000 stolen from them would be infuriated. There was no need for extraneous evidence of appellant's "rage" to convince the jury of that. The government simply did not have the required "important purpose" for the introduction of this threat evidence. U.S. v. Morgan, 786 F.3d 227, 232 (2d Cir. 2015).

---

[29] As the defense argued, the most likely impact of the evidence was to paint Tartaglione as hot-tempered, with a "propensity to snap." *See* p.49, *ante.*

Additionally, the prosecution had a discordant tendency to characterize appellant's financial condition differently depending on its desired outcome. To justify the threat evidence, it contended that appellant was financially desperate. However, in support of a different evidentiary motion, it argued the reverse, describing Tartaglione as a wealthy drug kingpin with money to burn:

> TARTAGLIONE owns multiple luxury vehicles and regularly makes a large amount of cash deposits at various ATMS as well as cash used at Connecticut casinos, totaling tens of thousands of dollars in cash.... *Govt's Applications for Cell Cite Location Data*, Dkt.#146-1, p.10, ¶17; and Dkt.#146-2, p.8, ¶h.

Given the prosecution's mercurial approach to Tartaglione's financial situation, it was particularly inappropriate for the trial court to accept its "dire financial straits" theory as a basis for admitting highly inflammatory threat evidence.

Moreover, the court's decision to admit this evidence to prove appellant's financial desperation was incompatible with its exclusion of evidence that cooperating witness Sullivan was provably feeling similar if not more financially desperation and was thus a more likely culprit.

Sullivan testified that he invested in Luna's cocaine purchase and lost his investment. At around the same time, he testified, his construction business was collapsing (T1124). Appellant sought to introduce evidence of Sullivan's financial desperation:

There's a series of texts that go to Sullivan's financial crisis.... [I]t's certainly relevant to show that he was the one in financial need. He was the one who lost money. And it goes without argument that he is the one who was motivated to collect money from Luna, not Tartaglione (T2884).[30]

Appellant argued that proffered texts between Sullivan and his wife — including his wife telling Sullivant that a creditor was "ready to put it in collections" — were admissible as present sense impression evidence, showing Sullivan's state of mind. The court rejected the defense argument, concluding that the texts were untimely hearsay, and that the texts were exchanged "months after... everything that matters here in this case." It ruled that they were not "present sense impression," but were offered to make the point that the Sullivans were broke." (T2885).

When the defense noted that some of the texts were contemporaneous to the victims' disappearance, the court found another reason for exclusion: "It's... cumulative. You have got evidence that he was having financial issues." (T2886-2887).

Both the defense and prosecution sought to introduce evidence they claimed was relevant to a financially desperate state of mind. The most obvious difference, again, was that one was damaging to a government witness while the other was damaging to appellant. Such unequal treatment inevitably deprived appellant of due process of law.

---

[30] The trial court also precluded defense counsel from asking Sullivan whether he was the one who was trying to recover the money, not appellant (T1135).

53

**(B)**

### 1. DNA Evidence

Charity Davis, an FBI forensic examiner, testified about DNA testing done by her unit's biologists on material recovered from the Likquid Lounge (T1932, 1951, 1963).[31] Through Davis, the prosecution sought to introduce her report opining that it contained Martin Luna's DNA.  Appellant objected because Davis had not conducted the testing (T1950).

The district court overruled the objection as "waived" because it was not in a motion *in limine* (T1950, 1964-1965). The prosecution speculated that the defense intentionally delayed its objection (T1973-1974). Defense counsel did not offer an excuse for not raising it pretrial, but assured the court that it was unintentional and not tactical (T1975).

Despite counsel's assertion to the contrary, the court concluded counsel was lying: it was a "tactical decision[] to wait until the last minute" and "play gotcha" (T1977-1978).  The ruling was based solely on a finding of waiver, not on the merits. *Id.* This was error: there was *no* evidence that appellant intentionally relinquished his right to object. At worst, his attorneys' failure to object pretrial was an oversight.

---

[31] According to the government, the victims had been killed at the Likquid Lounge, a bar owned by appellant's brother. *See, e.g.,* T3113.

54

Waiver "can only result from a defendant's **intentional** decision not to assert a right." U.S. v. Quinones, 511 F.3d 289, 321 n.21 (2d Cir. 2007)(*emphasis added*). *See also* U.S. v. Spruill, No. 13-4060-cr (2d Cir. 2015). The government bears the burden of proving a defendant's waiver by a preponderance of the evidence. U.S. v. Parse, 789 F.3d 83, 112 (2d Cir. 2015).

Although it may be preferable for parties to object or litigate controversial evidence pretrial, the objection's timing here met statutory requirements. FED. R. CRIM. P. 12 specifies which motions *must* be made pretrial; admission of the DNA report was *not* one of them.

Evidentiary objections *not* covered by Rule 12 must be made before "it is too late for the court to change its rulings...." U.S. v. Meserve, 271 F.3d 314, 325 (1st Cir. 2001). The timing is flexible and may give way to the "heat of a hotly contested criminal trial." U.S. v. Check, 582 F.2d 668, 676 (2d Cir. 1978)(district court erred in denying defendant's objections, even "assuming *arguendo* that counsel's delay in particularizing his objections... can be considered an unreasonably long delay").

Give the enormous amount of discovery, the numerous defense and prosecution pretrial motions, the 17-count indictment involving many murder charges and the death penalty, it is understandable that one potential pretrial motion, however significant, escaped the defense team's attention.

Significantly, although the government had seven years to do so, it did not withdraw the death penalty until four months before trial (T1977). The trial court never presumed the government was acting in bad faith, that the seven-year time lapse was a "tactical decision" to waste the defense team's time and attention. Yet it assumed that defense counsel's failure to raise this issue pretrial *must* have been tactical because "there was plenty of time" for the defense to prepare its case (T1977). That assumption was belied by the court's own acknowledgement that the defense had had "a million things to do in trial prep" (T1190).[32] In short, the court's finding of waiver was unsupported by either the law or facts.

By contrast, both the law and facts supported appellant's contention that Davis's testimony about DNA tests conducted by non-testifying lab analysts was improperly admitted.

In response to appellant's hearsay objection, the government contended that the DNA report was not testimonial, since it was "not done for the purpose of criminal prosecution." Thus, "there's no confrontation clause issue here" (T1975). The government relied on *U.S.* v. *James*, holding that a toxicology report was not

---

[32] The court had previously acknowledged that representation in a death penalty case was difficult and time-consuming: "this is a capital case... And, so, you've got a lot of people working really hard"; "I'm getting applications [from the defense] on a weekly basis for this, that or the other thing;" "there's so much work that goes into this being a capital case." *Suppression Hearing,* 11/10/2022 at pp.20-22.

56

testimonial if there was no indication that "a criminal investigation was contemplated" when it was prepared. 712 F.3d 79, 101 (2d Cir. 2013).

Defense counsel responded that, unlike in *James*, the FBI DNA report was clearly testimonial (T1976). The defense relied on *Bullcoming* v. *New Mexico*'s holding that a defendant's Confrontation Clause rights were violated by the introduction of a forensic test through an analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test...." 564 U.S. 647, 131 S.Ct. 2705, 2709-2710 (2011).[33] The Court ruled that "even those [reports] prepared by analysts who purportedly act as 'mere scrivener[s]' of machine-generated results are testimonial statements that are inadmissible without confrontation." *Id.* at 2705. *See also* Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 2530, 2536 (2009)(reports including the results of forensic analyses are testimonial, and analysts who perform the tests are witnesses against the defendant for Sixth Amendment purposes; "[c]onfrontation is one means of assuring accurate forensic analysis," which "is not uniquely immune from the risk of manipulation"); Smith v. Arizona, 602 U.S. 779, 144 S.Ct. 1785 (2024).

In an analogous case, an expert witness testified that a non-testifying analyst had tested DNA samples, and the witness's role was to review the analyst's work and

---

[33] Appellant also relied on *Garlick* v. *Lee*, 1 F.4th 122 (2021), which held that introduction of an autopsy report through a witness who had not participated in the autopsy or in the preparation of the report violated the defendant's Sixth Amendment right of confrontation.

"independently review" his conclusions. She described the work the lab had done and "provided her conclusions — all without having tested the samples herself." U.S. v. Seward ,135 F.4th 161, 168 (4th Cir. 2025). The Fourth Circuit concluded that admitting her testimony was error, since she "relied on the work produced by another analyst to reach her expert conclusions." *Id.*

Here too, appellant's Confrontation Clause rights were violated by Davis's testimony about DNA tests she had not herself performed and the introduction of the report based on tests performed by non-testifying analysts.

## 2. Cell Site Location Evidence

Before trial, appellant moved to exclude evidence from a drive test FBI Agent Perry performed to obtain cell site location data.  Counsel argued that the government did not demonstrate the evidence's reliability, and Perry — a member of the FBI's Cellular Analysis Survey Team (CAST)— failed to preserve the underlying data, except for a few selectively chosen screenshots. The court denied the motion.

### A. The Unreliability of The Drive Test Evidence

When a cellphone call is made, the call is routed through a cell tower. Cellphone companies keep records (CDRs) which indicate which site processed the call. CDRs "contain limited information" and don't have "documented error rates or validation methodologies." Victoria Saxe, *Junk Evidence: A Call to Scrutinize*

58

*Historical Cell Site Location Evidence*, 19 U.N.H. L. Rᴇᴠ. 133, 142 (2020). CDRs "are merely records used by cellphone companies [to]...generat[e] bills...." *Id.* CDRs do not pinpoint a phone's exact location; at best, they indicate a device was likely within a tower's general coverage area. U.S. v. Baker, 58 F.4th 1109, 1125 (9th Cir. 2023); U.S. v. Medley, 312 F.Supp.3d 493, 499-502 (D. Md. 2018), *aff'd* 34 F.4th 326, 337-338 (4th Cir. 2022); N.J. v. Burney, 298 A.3d 1080, 1092 (N.J. 2023).

In short, identifying a cellphone's location based on CDRs has "glaring deficiencies," notably the absence of reliable information of a given tower's coverage area and the absence of "peer review or error rates." Andrew McQuilkin, *Sleeping Gate-Keepers: Challenging the Admissibility of Cell-Phone Forensic Evidence Under Daubert*, 11 J. Hɪɢʜ Tᴇᴄʜ. L. 365,399–402 (2011). *See also* Thomas J. Kirkham, *Comment, Rejecting Historical Cell Site Location Information as Unreliable Under Daubert and Rule 702*, 50 U. Tᴏʟ. L. Rᴇᴠ. 361 (2019).

Law enforcement often resorts to drive tests to bolster CDR data. Drive test results are admissible when shown to be adequately reliable, but most courts recognize their significant limitations and do not admit such results unless accompanied by an accounting for their shortcomings: "The admission of historical cell-site evidence that overpromises on the technique's precision — or fails to account adequately for its potential flaws — may well be an abuse of discretion." U.S. v. Hill, 818 F.3d 289 (7th 2016).

In this case, however, the court ignored all but one of the technique's potential problems, *i.e.,* its limited ability to pinpoint location (2/14/2023 proceeding, Dkt. No. #476 at p.89). Even as to this shortcoming, the trial court failed to assess its particular relevance to the facts here. Instead, it held that it was a matter for cross-examination, not a basis for exclusion, and permitted the evidence to be introduced without further inquiry.

Even a cursory review would have demonstrated the enhanced risk of unreliable cell site data in a case such as this, involving calls from small towns, rural areas, uninhabited mountains, and forests, rather than densely populated cities.

The greater the population density, the smaller the range of a tower's general coverage. In a crowded city, the range will normally be only a few blocks; in rural areas, it may be thirty miles or more. Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J.L. & TECH. 3, 5 (Fall 2011).[34] *See also In re Application Of U.S. for an Order for Disclosure*, 405 F.Supp.2d 435 (S.D.N.Y. 2005); U.S. v. Pembrook, 119 F.Supp.3d 577, 579 (E.D. Mich. 2015); Todd A. Spodek, *Understanding Cell-Site Evidence in Criminal Cases: What It Is, How It's Used, and Why It Matters*, at p.2,

---

[34] "If the coverage area is thought of as a circle and the furthest distance from the cell site where service is available is the radius of that circle," then the coverage area of up to 30 miles may result in a "total coverage area of approximately 2,700 square miles." *Id.* at p.4, n.12

60

available at medium.com/spodeklawgroup/understanding-cell-site-evidence-in-criminal-cases-what-it-is-how-its-used-and-why-it-matters-f1786- ace6133.

In lower Manhattan, for example, cell towers may be only several hundred feet apart, In re Applic. Of U.S. for an Order for Disclosure, 405 F.Supp.2d at 437, so drive test data will likely constitute reliable evidence that a caller was in a well-defined area. *See* U.S. v. Ray, 20-cr-110 (S.D.N.Y. 2022)("At best, historical cell-site analysis can show with sufficient reliability that a phone was in a general area, **especially in a well-populated one**")(*emphasis added*); U.S. v. Frazier, 442 F.Supp.3d 1012, 1024 (M.D. Tenn. 2020)(same). In a case involving cell towers in sparsely populated areas, as here, it is much harder to narrow down a call's origin.[35]

The trial court here improperly relied on cases involving calls made in densely populated New York City boroughs to support its decision to permit the drive test testimony.[36] This was clear error.

Compounding the error, the court failed to consider, much less required the government to disclose, whether other relevant conditions during the drive test were identical or similar to those that existed when the calls occurred, or whether Perry

---

[35] Tartaglione's ranch was located Otisville, New York, which had a population of 969 as of 2020. Wikipedia, https://en.wikipedia.org/wiki/Otisville,_New_York.

[36] The court relied on cases analyzing call data from Manhattan (U.S. v. Ray, *supra*, Dkt. #469), the Bronx (U.S. *v.* Rosario, 2014 WL 6076364 (S.D.N.Y. 2014)), and Brooklyn, New York (U.S. *v.* Powell, 2022 WL 4451389 (E.D.N.Y. 2022). *See* Dkt. No. #476 at pp. 89-90.

adjusted his drive test analysis to account for these and other possible variables.

There was no consideration of whether:

- some cell towers were undergoing repairs and/or maintenance when the relevant calls were made, causing service disruption.[37]

- Natural weather events disrupted cell tower service. *See* John B. Minor, *Forensic Cell Site Analysis, supra* at p.42

- Traffic congestion, accidents, and sporting or other public events had increased the number of users seeking a signal, causing phones to connect to a cell site that was neither the nearest nor the strongest signal. *See generally,* Victoria Saxe, *Junk Evidence, supra* at p.1389.

- Whether the data accounted for the fact that "drive-tests cannot accurately assess in-building and, in most cases, in-car scenarios." Vladan M. Jovanovic, Brian T. Cummings, *Analysis of Mobile Phone Geolocation Methods Used in US Courts,* 11 IEEE 28037, 28049 at 28049 (2023).

Particularly where, as here, significant time has passed between the phone calls and the drive test,[38] such evidence should not be admitted unless the government adequately accounts for those issues and describes how their impact was addressed. U.S. v. Morgan, 292 F.Supp.3d 475, 479 (D.D.C. 2018), *aff'd* 45 F.4th 192 (D.C. Cir. 2022). Addressing the time gap was particularly important in this case, since cellphone coverage on a mountainside forest (where Tartaglione's ranch was located) is greatly impacted by the time of year. "Seasonal changes in [sector coverage] areas

---

[37] "An outage of neighboring cell sites will affect the radio frequency coverage area, thereby expanding the coverage of one or more cell sites." John B. Minor, *Forensic Cell Site Analysis: A Validation & Error Mitigation Methodology*, J. OF DIGITAL FORENSICS, SECURITY AND LAW, Vol. 12, No.2, Art. 7, at p.43 (2017).

[38] The drive test here occurred approximately 10 months after the calls in question (T2753).

with a lot of deciduous vegetation can be large." Jovanovic & Cummings, *Analysis of Mobile Phone Geolocation Methods Used in US Courts,* 11 IEEE at 28051. *See also* Int'l Telecommunications Union, *Attenuation in Vegetation, Recommendation* ITU-R P.833-7 (Feb. 2012).

Notably, CAST agents often choose *not* to perform a drive test in cases where a significant amount of time has passed, due to concerns about accuracy. For example, in *Holbrook* v. *Commonwealth*, a CAST agent "did not perform a drive test...due to the passage of time," concluding that the test would "not yield accurate information as to the 'footprint' of the tower...." 525 S.W.3d 73, 81 (Ky. 2017).

Crucially, given the significant time lapse, the court should have required the prosecution to describe what steps Perry took to account for the relevant differences between conditions during the drive test and those which existed when the calls occurred.

It should have required the government to indicate whether Perry "cross-check[ed] [the] provider's tower list closest to the time the incident occurred with the provider's most current tower list to see if any changes have occurred to the tower or the cellular network." U.S. v. Morgan, *supra* at 480. Similarly, it should have ascertained whether Perry contacted the "providers themselves to ask if any significant changes had occurred to the network." *Id. See also* U.S. v. Cervantes, No.

63

12-cr-792 (N.D. Cal. Dec. 1, 2015).[39]  Here, no such accounting was provided, and none was required by the trial court.

The court also did not ask if Perry followed CAST's own protocol to ensure the reliability of drive tests, which requires:

> A second agent who did not perform the drive test analyzes the draft analysis and checks for any errors made on the part of the initial inputting agent or possible errors in the software's generated data .... The agent conducting the peer review process has all the drive test data and any other information the initial agent had .... This second agent also cross-checks the data by referencing different software programs and other collections of data.

U.S. v. Morgan, 292 F.Supp.3d at 481-482. Since Perry did not preserve his underlying data as the protocol required, it appears likely it was not, in fact, followed; certainly, the trial court could not assume it to be so. *See* Point III(B)(2)(b), *post.*

Had the district court assessed the drive test data in light of the specific circumstances of this case, it would have found an inadequate scientific basis for its admissibility.  Simply put, the court did not require, and the government did not demonstrate, the accuracy and reliability of the drive-test testimony. Thus, appellant's motion to preclude this evidence should have been granted.

---

[39] In *Cervantes*, the trial judge "found that the delay between September 2011 calls and December 2012 field experiments was significant, and required additional foundation...." *Id.*

Its prejudicial impact was magnified by the government's summation, which repeatedly mischaracterized the results of the drive test, suggesting that it pinpointed exact locations, despite the court's conclusion to the contrary.[40] For example, prosecutors told the jurors:

- [Y]ou know that [Benderoth and Biggs] ended up at the Likquid Lounge that day because of their cell site activity (T3110);

- Where is the Defendant while all of this is happening? He's at the bar.... And you can see all of this with the cell site data for the defendant's phone (T3111);

- And where is the defendant when he's making these calls? At the Likquid Lounge. Both of his phones, his personal [number] and the burner [number], are there (T3120);

- Marcos Cruz told you that after he left,  he went to...the Golden Shoes.... And you can see the cell site data showing that that's where Marcos Cruz went (T3127).

The improper admission of the drive test evidence evidence combined with its improper use on summation deprived Mr. Tartaglione of due process and a fair trial.

---

[40] Inexplicably, despite acknowledging that cell site testimony cannot be used to "pinpoint" someone's precise location, the trial judge likewise used this evidence in denying appellant's Rule 33 motion: "**Cellphone data showed the location of the murders.**" Sentencing Transcript, June 10, 2024 at p.15 (*emphasis added*).

B. The Failure to Preserve Underlying Data from The Drive Test

Appellant also moved to preclude Perry's testimony based on his failure to preserve underlying test data. During discovery, the government gave two contradictory explanations for that failure: (1) it no longer existed "because FBI switched over systems." Swergold Memo, 7/22/2022, Dkt. #428-3; (2) the "data no longer exist[ed] because Agent Perry no longer uses the devices and laptop that he used during the drive test ...." Swergold Email, 2/23/2023, Dkt. #428-2. At a hearing on appellant's motion, the government gave both explanations. First, it blamed the change-over in FBI systems, Dkt No. #509, 3/3/2023 proceeding at p.112, then it added the 'new laptop' factor:

> To the extent the software might have saved any data, which he doesn't know whether it did or not, that data does not exist because those devices and the laptop that he was using and the systems have all changed over. *Id.* at p.118-119.

Instead of the underlying data, the government sought to introduce into evidence four screenshots Perry had taken during the drive test of the "particular location that he believed was relevant...." *Id.* at 119. In other words, he selectively chose a small portion of the drive test to preserve, although the software he used was

66

working throughout the drive. In defense counsel's view, Perry "cherry-picked" which data to preserve. "[T]hat's functionally the same as destroying it." *Id.* at 119-120.

The court rejected counsel's position as "borderline frivolous." *Id.* at 124. It ignored one of the government's explanations (that Perry had changed laptops) and relied on the other (that the FBI had switched systems), without requiring verification of either. *Id.* at 117.

But it was the switch-over theory that was "borderline frivolous." First, there was no evidence that the FBI in general, or CAST in particular, had switched computer systems. In fact, the software used during Perry's drive test ("Gladiator") is still widely used by CAST. *See* <u>Idaho</u> v. <u>Kohberger</u>, cr-01-24-31665 (Ida. Dist.Ct. 2024)(Reply, Motion in Limine #2, Exh. 1).

Moreover, even if some FBI-wide computer-system change had occurred, it is "borderline frivolous" to suggest that the FBI as an organization, or CAST (an elite unit which creates and analyzes cell phone data) would change systems without safeguarding their data. CAST's own policies required no less:

> When used in FBI investigations, **all** CAST-generated evidence and discovery items, including ... **drive test data,** ... **must be serialized/uploaded into the CAST subfile within the appropriate investigative file**. FBI Criminal Investigative Division, <u>Cellular Analysis Survey Team Policy Guide</u>, ¶4.9.1, p.10 (Jan. 5, 2018)(*emphasis added*).

The claim that Perry innocently discarded the drive test evidence when changing computers is equally unlikely. When work computers are replaced, important data from the old computer is customarily transferred to the new one. An FBI Special Agent who keeps pertinent data on his computer for use in criminal trials would certainly do no less. Failure to take this elemental step would, at least, represent gross negligence.

The court ruled that it was acceptable for Perry to preserve only "the data points that he thought were relevant to his conclusions." Dkt. No.#509 at p.123. Not only does this ruling conflict with the CAST protocol cited above, it is antithetical to a proper assessment of the proffered data and expert testimony. It was up to the court, *not* Perry, to determine which data points constituted "a reliable foundation and [were] relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).[41]

"Drive test data" involves far more than the four screen shots that Perry decided "were relevant to his conclusions." An FBI drive test, such as this one,

> employs a piece of survey equipment known as a Gladiator Autonomous Receiver ("GAR") to survey networks in investigated areas. The GAR is a mobile computing system that scans the area driven by an agent, collecting the possible coverage area of towers that an agent specifically

---

[41] Significantly, Perry was testifying as an expert:
"Although we decline to prohibit categorically the use of case agents as experts, we note that the Federal Rules of Evidence and the Supreme Court place the responsibility upon the district courts to avoid falling into error by being vigilant gatekeepers of such expert testimony to ensure that it is reliable." U.S. v. Dukagjini, 326 F.3d 45, 56 (2d Cir. 2003).

> noted in the system beforehand as well as surrounding towers' coverage areas. The GAR measures each tower's signal strength as the agent performs the drive test.

U.S. v. Morgan, *supra* at 480. In order to test the reliability of his "conclusions," one would have to assess the underlying data. As appellant's telecommunications expert explained:

> [T]he mobile network is a dynamic environment, and the signals can be affected by the environment into which they are broadcast. As a result, we do not analyze only specific points, but the totality of the data. For example, if I am surveying the area around a specific residence, I not only want to view one data point from the street in front of the residence I also want to view the data leading up to the residence, along the roadway, and the neighborhood. Declaration of Spencer J. McInvaille, Dkt. #428-1 at ¶12, p.4.

Moreover, it is "standard practice" for cell site analysts to "retain data they collect in testing and analysis" to ensure "accurate reporting" and allow for "peer review." *Id.* at ¶16, p.6. McInvaille concluded that, since Perry's drive test data had been destroyed, the screenshots which the government sought to introduce at trial could not be independently verified. *Id.* at ¶17, p.7.

The defense expert's conclusion was not novel. As the *Morgan* court noted, CAST protocol requires peer review; it further requires that the person conducting the peer review process

> has all the drive test data and any other information the initial agent had.... This agent also cross-checks the data by referencing different software programs and other collections of data.

U.S. v. Morgan, *supra* at 482. In *Morgan*, for example, the peer review process revealed that the agent conducting the drive test "input a wrong code" in his draft analysis, "but the peer review process corrected the error." *Id.*

That is precisely what was missing in this case. Because the underlying drive-test data was not preserved, it was impossible to know whether Perry had, for example, "input a wrong code." Without underlying data to demonstrate that the drive-test evidence was sufficiently reliable to form the foundation for Perry's expert testimony, that testimony should have been excluded.

*        *        *

In sum, the court below clearly erred in allowing the government to introduce evidence which should have been excluded, and excluding defense evidence which should have been admitted. Accordingly, appellant's convictions must be reversed and the case remanded for a new trial.

70

## POINT IV

SINCE THE GOVERNMENT'S EVIDENCE AT TRIAL ESTABLISHED THAT ANY DRUG CONSPIRACY ENDED WELL BEFORE THE MURDERS OCCURRED, IT WAS INSUFFICENT TO PROVE APPELLANT'S GUILT OF MURDER IN FURTHERANCE OF AN ONGOING DRUG CONSPIRACY

Appellant's indictment charged that, while engaged in a drug trafficking crime he: aided, abetted, and committed murder; used and carried a firearm to commit murder; and traveled in interstate commerce to commit murder on April 11, 2016. However, the government's evidence proved that any drug conspiracy ended before that date. Nor was there evidence that the murders were committed to further the drug conspiracy's aims. Accordingly, his convictions on those charges must be reversed and the charges dismissed.

## 1. Standard of Review

This Court reviews the sufficiency of evidence *de novo*. U.S. v. Sabhani, 599 F.3d 215, 241 (2d Cir. 2010). The evidence is viewed in its totality, in the light most favorable to the government. U.S. v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012). A guilty verdict will stand if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

71

However, if "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." U.S. v. Valle, 807 F.3d 508, 515 (2d Cir. 2015)(*citations omitted*). *See also* U.S. v. Vernace, 811 F.3d 608, 615 (2d Cir. 2016).

**2.  The Evidence Established That No Drug Conspiracy Existed When the Victims Were Allegedly Kidnapped and Murdered**

The prosecution was required to show a connection between the above-mentioned counts and Tartaglione's alleged involvement in the charged drug conspiracy. Additionally, it had to establish appellant engaged in a drug trafficking offense *at the time* he allegedly committed those offenses. U.S. v. Guerrero, 813 F.3d 462, 465 (2d Cir. 2016). So long as "the [drug] conspiracy is ongoing when the killing occurs, the drug-offense and killing elements of [those charges] are satisfied by independent acts that overlap in time." U.S. v. Santos, 541 F.3d 63, 68 (2d Cir. 2008). *See also* U.S. v. Acosta, 19-2189 (2d Cir. Nov. 2, 2020).

The government claimed appellant was part of a cocaine conspiracy beginning the summer of 2015. His role was to give money to Martin Luna — the only conspirator with cocaine contacts. In late 2015, Luna told Tartaglione that the money had been stolen (T2084). Luna subsequently announced the end of the drug scheme, telling co-conspirator Cruz: "**This is the end of this business. Everything has come**

72

**to an end**. There is no money. It all ended badly" (T1380). Cruz testified further: "[Luna] told me not to bother him again, not to call him again. **This business had come to an end.**" (T1381). With the exit of the group's only cocaine contact,[42] Luna's affirmative act of ending "this business" was, in fact, the end of the conspiracy. *See* U.S. v. Rucker, 586 F.2d 899, 906 (2d Cir. 1978)(a conspiracy is ended once it is "consummated, abandoned, or otherwise terminated by some affirmative act").

Appellant's alleged attempt to recover his initial investment after the drug conspiracy fell apart did not prolong it. There was no evidence that appellant sought to recover drug sale proceeds; rather, Cruz testified that Tartaglione just wanted his own investment back:

> Q:      [H]ow much money did Nick tell you he wanted taken out of the cocaine business for himself?
>
> CRUZ:  Just what he had invested (T1351).

In short, the government's evidence at trial was that *after* the drug conspiracy ended, Luna was kidnapped because Tartaglione wanted his *own money* back.[43]

Moreover, the government did not offer any other "meaningful connection between the killing[s] and the drug offense." U.S. v. Santos, 541 F.3d at 69. *See also*

---

[42] The government offered no evidence that the remaining conspirators sought an alternative source for cocaine.

[43] Co-conspirator Sullivan likewise testified that appellant only wanted his own initial investment back (T1064).

73

U.S. v. Desinor, 525 F.3d 193, 202 (2d Cir. 2008); U.S. v. Kemp, 21-1684 (2d Cir. Jan. 26, 2023).

Although the government did not have to establish that a drug-related motive was the sole purpose, it had to prove that it was at least one purpose of the killings. U.S. v. Desinor, *supra. See also* U.S. v. Aguilar, 585 F.3d 652, 659 (2d Cir. 2009). The government did not meet even that low bar, failing to show *any* drug-related purpose. Its evidence showed only one potential motive: to recover money appellant possessed prior to any drug conspiracy. *Compare, e.g.,* U.S. v. Santiago-Ortiz, 18-3830 (2d Cir. Dec. 18, 2019)(sufficient evidence of drug-related purpose where jury could conclude that defendant murdered the victim... to command respect as leader of drug-trafficking organization and further goals of heroin conspiracy).

Accordingly, appellant's convictions on Counts 2-8 and 14-17 must be reversed and those charges dismissed.

## CONCLUSION

For the reasons stated in Points I, II, and III, appellant's convictions should be reversed and the case remanded for retrial; for the reasons stated in Point IV, appellant's convictions on Counts 2-8 and 14-17 must be reversed and those charges dismissed.

Respectfully submitted,

74

/s/ <u>MARSHA TAUBENHAUS</u>

MARSHA TAUBENHAUS

*Attorney for Defendant Nicholas Tartaglione*

1632 1st Avenue #21040

New York, NY 10028 (917) 426-4880

taubenhauslawoffice@gmail.com

INGA PARSONS

*Attorney for Defendant Nicholas Tartaglione*

3 Bessom Street Ste 234,

Marblehead MA  01945

5 Columbus Circle Ste 710

New York NY  10019, (c) 781-910-1523

Inga@IngaParsonsLaw.com

SUSAN C. WOLFE

*Attorney for Defendant Nicholas Tartaglione*

Law Office of Susan C. Wolfe

2400 Johnson Avenue Suite 1G

Bronx, New York 10463

917-209-0441

scwolfe@scwolfelaw.com

75

## CERTIFICATION

I, MARSHA TAUBENHAUS, attorney for the Defendant-Appellant, do hereby certify that the foregoing Brief exceeds the type-volume limitation as set forth in FRAP 32(a)(7), in that the Brief is 17,560 words.

/s/ <u>MARSHA TAUBENHAUS</u>
MARSHA TAUBENHAUS